LOUISVILLE & N. R. CO. v. KENTUCKY RAILROAD COMMISSION et al.

(District Court, E. D. Kentucky.  May 14, 1914.)

1. INJUNCTION (§ 158*)—INTERLOCUTORY INJUNCTION—DECISION—FINALITY.
   A decision either way on a motion for an interlocutory injunction is an exercise of discretion and is not final, and the court may, on a subsequent application, reach a different conclusion on the same or more convincing evidence.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 341; Dec. Dig. § 158.*]

2. INJUNCTION (§ 158*)—INTERLOCUTORY INJUNCTION—SUCCESSIVE MOTIONS.
   The renewal of a motion for an interlocutory injunction on grounds, or on evidence which should have been presented on the first application, will be discouraged, and an application once refused will not be at a later stage granted, save in a clear case.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 341; Dec. Dig. § 158.*]

3. INJUNCTION (§ 158*)—INTERLOCUTORY INJUNCTION—SUCCESSIVE MOTIONS.
   Where a motion by a railroad company against a state railroad commission for an interlocutory injunction to restrain the enforcement of rates ordered by the commission was denied on the ground that the supporting affidavits stated only conclusions of law, a subsequent motion rested in the discretion of the court, in the absence of anything to show bad faith on the part of the company.
   [Ed. Note.—For other cases, see Injunction, Cent. Dig. § 341; Dec. Dig. § 158.*]

4. CARRIERS (§ 12*)—REGULATION—RATES—PRESUMPTIONS.
   That a railroad company has for a considerable time voluntarily maintained a given rate is evidence of the reasonableness thereof, and supports an order of a state railroad commission fixing that rate as lawful, unless the rate so maintained was special to meet some special situation, like water competition, or other special conditions.
   [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

5. CARRIERS (§ 12*)—REGULATION—RATES—PRESUMPTIONS.
   Where a railroad company maintained low rates for grain inward bound to distillers to build up the distilling business, and thereby receive a high-class return traffic, and the company maintained the same rates for a long time after the reason for their establishment had ceased to exist, the rates were prima facie reasonable, and an order of a state railroad commission fixing the rates for all grain inward bound as lawful was sustained by evidence, for the commission was not bound to as-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes
    214 F.—30

sume that an equivalent result would not follow as to outward-bound flour from grain inbound to millers, or as to all the reverse traffic which would normally result directly or indirectly from grain moving in one direction, and the burden was on the company to prove that the rates were unreasonable, before it could complain.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–11, 15–20; Dec. Dig. § 12.*]

6. CARRIERS (§ 18*)—REGULATION—RATES—PRESUMPTIONS.

Where a state railroad commission established as reasonable, for all grain inward bound, rates maintained by a railroad company for grain inward bound to distillers for the development of the distilling business, and thereby receive a high-class return traffic, and the company, at the hearing before the commission, declined to exercise its privilege of showing that it would suffer loss by the application of the rates, the court, on the application of the company, could not set aside the order of the commission and enjoin the enforcement of the rates on mere probability that the return traffic would not be as profitable as the products of distillers had been.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

7. COURTS (§ 366*)—CONTROLLING DECISIONS—CONSTRUCTION OF STATE STATUTES.

The construction by the highest court of a state of a state statute defining the, powers of a state railroad commission is binding on a federal court in determining the powers of the commission.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 954–957, 960–968; Dec. Dig. § 366.*]

8. INJUNCTION (§ 26*)—MULTIPLICITY OF ACTIONS AT LAW.

Where an order of a state railroad commission requires a railroad company to make reparation by the payment of specified sums to 19 separate shippers, and the commission and shippers intend to bring but one suit, the railroad company was not entitled to injunctive relief against the enforcement of the order of reparation.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 24–49, 54–61; Dec. Dig. § 26.*]

9. CARRIERS (§ 18*)—ESTABLISHMENT OF NEW RATES—ORDERS.

Where the court restrained the enforcement of rates fixed by a state railroad commission on condition that the carrier should pay into court month by month all the freight charges which had been collected in excess of the rates fixed by the commission, and that the payments should be refunded on it being finally determined that the excess was not lawfully collected, otherwise returned to the carrier, the court would not modify the order so far as it had been executed, but it could modify it as to its future effect.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

10. CARRIERS (§ 18*)—ESTABLISHMENT OF RATES—ORDERS OF STATE RAILROAD COMMISSION—INJUNCTION.

Where a railroad company, attacking orders of a state railroad commission fixing rates, will lose but little pending an appeal to the Supreme Court, if the rates are enforced pending the appeal, the trial court will not restrain the enforcement of the order fixing the rates but will leave that matter to the Supreme Court.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 13, 16–18, 20, 24; Dec. Dig. § 18.*]

In Equity. Suit by the Louisville & Nashville Railroad Company against the Kentucky Railroad Commission and others. On motion

under Judicial Code (Act March 3, 1911, c. 231) § 266, 36 Stat. 1162 (U. S. Comp. St. Supp. 1911, p. 237), for interlocutory injunction. Denied.

Henry L. Stone and Edward S. Jouett, both of Louisville, Ky., for complainant.

Edwin W. Hines and J. V. Norman, both of Louisville, Ky., for defendants.

Before WARRINGTON and DENISON, Circuit Judges, and SANFORD, District Judge.

PER CURIAM. The general situation appears by our former opinion ([C. C.] 186 Fed. 176, sub nom. L.-N. R. R. v. Siler) and by the opinion of the Supreme Court (231 U. S. 298, 34 Sup. Ct. 48, 58 L. Ed. ——, sub nom. L.-N. R. R. v. Garrett). On the former hearing, plaintiff urged, as one ground of relief, that the order of the Railroad Commission had been made without any evidence whatever that its newly prescribed rate was reasonable, and hence that the order was invalid; and it supported this allegation by affidavits that, upon the hearing before the Commission, no evidence to this effect was offered. We held that these affidavits stated only conclusions of law, so that the allegation of lack of evidence was itself not proved; and this view was also taken by the Supreme Court. As to the desired injunction against the reparation order, it was held, both by this court and the Supreme Court, that the question could not be raised on a record to which the reparation claimants were not parties. The case having been remanded, plaintiff now files an amended bill and makes a new motion for interlocutory injunction. As to the future rate, the present motion is based upon the same proposition that the Commission had before it no evidence that the new rate was reasonable; and, upon this motion, the allegation is supported by a transcript of all the proceedings before the Commission, and it is said that, by this transcript, the lack of any evidence to support the Commission's finding sufficiently appears. As to the reparation order, it now appears that the claimants under that order have been made parties.

[1] Counsel for the Commission and the claimants first urge that the matters have been adjudicated, or that, at least, we ought not to hear, for the second time, the same motion in the same case. A decision either way upon a motion for interlocutory injunction is the exercise of discretion, and such exercise is not final. Acme Co. v. Commercial Co. (C. C. A. 6) 192 Fed. 321, 112 C. C. A. 573. It therefore must continue within the power of the court upon a later application to reach the other conclusion upon more convincing evidence, or, indeed (save for the effect of a mandate from a reviewing court), upon the same evidence. The opinion and mandate of the Supreme Court cannot be considered as controlling, since that court carefully refrained from deciding what the effect would have been if the allegation of lack of evidence had been proved or if the necessary parties had been present; and the mandate takes effect with reference to the then existing record.

[2] On the other hand, the renewal of such a motion upon grounds or upon evidence which should have been presented upon the first application is to be discouraged, and an application once refused will not, at a later stage, be granted, save in a clear case. Chancellor Vrooman, in Buckley v. Corse, 1 N. J. Eq. 504, 510.

[3] The result of such a situation as this is that the court has power to hear the renewed application on its merits; that whether it should do so is a matter of discretion; and that it would sharply refuse to do so, if it appeared that the first application had been with any purpose of experimenting with the court or of getting indirect advantages. We see no reason to think that there was any such purpose here, or to doubt that the imperfect showing upon the first hearing was the result of a good-faith mistake as to the kind of proof necessary to establish what counsel considered a really undisputed fact and as to who were necessary parties. The long delay which has operated to keep the restraining order in force resulted from the unexpected grouping of this case with other railroad cases in the Supreme Court, and can hardly be charged against plaintiff. Upon the whole, we think we ought to consider the merits of the motion.

It is next urged that, even if no evidence on the subject was put before the Commission, that fact does not justify this court in setting aside the order fixing a future rate; in other words, it is said that the cases in which the Supreme Court has, for this reason, vacated an order of the Interstate Commerce Commission do not apply where a federal court is dealing with the order of a state commission, and this for the reason that the Interstate Commerce Act expressly gives to the courts a power to review, while the Kentucky act contains no such general provision. It is an interesting question whether the power of this kind which the Supreme Court has exercised depends in any degree upon this clause of the Interstate Commerce Act (I. C. C. v. U. P. R. R., 222 U. S. 541, 547, 32 Sup. Ct. 108, 56 L. Ed. 308; I. C. C. v. L. & N. R. R., 227 U. S. 88, 92, 33 Sup. Ct. 185, 57 L. Ed. 431), or whether, since legislative power cannot be given to the courts, this exercise depends on the inherent right to forbid prejudicial action under color of an order invalid because made without jurisdiction (Procter v. U. S., 225 U. S. 282, 298, 32 Sup. Ct. 761, 56 L. Ed. 1091). However this may be, we think the question is not now controlling, and we pass it by without decision, assuming, but only for the purposes of this case, that, if in truth there was no supporting evidence, the order cannot stand.

[4] The meritorious question so developed should be approached in the light of these rules which we may take as now established: First, proof that a railroad company has for a considerable time voluntarily maintained a given rate is evidence of the reasonableness of that rate and will support an order fixing that rate as a lawful one; and, second, by way of modification or exception, if the rate so maintained was due, not to normal and ordinary causes, but was special and to meet some special situation (like water competition), its making and maintenance then cease to be any evidence that, in the absence of those spe-

cial conditions, it would be reasonable. I. C. C. v. L. & N. R. R., 227 U. S. 88, 33 Sup. Ct. 185, 57 L. Ed. 431.

[5] In the instant case, it is conceded that the new rates fixed by the Commission for all grain inward bound to all persons for all purposes were the same as the rates which the railroad had voluntarily maintained for many years for grain shipped inward bound to distillers for distilling purposes. Under the first rule just stated, this fact becomes, prima facie, an admission, and therefore evidence that the rate were reasonable for grain. The railroad seeks to bring the case within the above-stated second rule or exception, by showing that the rates upon all grain outbound and to all persons except distillers upon all grain inbound had always been much higher, and that the distillers' rate was an abnormal one induced and justified by two considerations: First, that a very low and (directly) nonremunerative rate for distillers was established for the sake of building up and encouraging an industry which otherwise could not have existed in the interior of the state at a distance from the Ohio river gateways where grain could be more cheaply obtained; second, that these grain shipments to distillers resulted in return outbound shipments of the finished product carrying a high rate and counterbalancing the unprofitable rate on the raw material. Based upon these premises, the railroad propounds a case of irreparable injury by reason of the reduction in its rates on all grain not for distillers and as to which the special conditions never have existed and do not exist. The claim that the newly ordered rate has never been voluntarily maintained, except for distillers, is conceded to be true; the two recited special conditions, encouragement of a new industry and a high-class return traffic, seem to have rested, at the hearing before the Commission, partly upon assertions of counsel rather than upon proof; but perhaps they were not disputed, and we take them as true.

The claim that the low rates amount to nothing as present evidence of what is reasonable, because they were specially made to build up an otherwise impossible industry, is fully met by the railroad's concession, made upon the argument before us and in its testimony before the Commission, that the same rates had been maintained for a long time after this reason had ceased to exist, and that its effort to discontinue these special rates was not because of the disappearance of this justification, but because the Interstate Commerce Commission had forbidden the special rate to one particular class of shippers. This concession removes all distinguishing force from this alleged unusual reason for the rate, and leaves the prima facie evidential force of that rate so far unaffected. The situation is analogous to that concerning which the Supreme Court said (I. C. C. v. L. & N. R. R. Co., supra, at page 99 of 227 U. S., at page 190 of 33 Sup. Ct. [57 L. Ed. 431]):

"When made, the increase was not because of the absence of water competition, but to make the sum of the locals correspond with the through rates. Under the circumstances, the maintenance of these low rates, after the water competition disappeared, tends to support the theory that, by an increase of business or other cause, they had become reasonable and compensatory."

We come next to the claim that the return traffic in the high-rate finished product neutralizes the evidential effect of the low inbound

rate on raw material. In this position, the railroad company may be right; we do not know. The Railroad Commission was not bound to assume, nor are we, that, if this result followed as to inbound grain and outbound whisky, an equivalent result would not follow as to outbound flour from grain inbound to millers, or as to all the reverse traffic which would normally result directly and indirectly from grain moving in one direction. This whole subject was peculiarly one for evidence; at the conclusion of the evidence, it might have been all one way, and it might have been so clear and undisputed that a finding against the railroad's contention would have been arbitrary; but the burden was on the railroad to dissipate the evidential effect of its voluntary maintenance of this rate for one purpose; and the railroad did nothing. It results that its admission against its interest remained unaffected and did form a substantial basis for the action of the Commission.

Turning now to the supposed disastrous effect of the new rate upon the general grain traffic for every purpose, the railroad company is met by a similar obstacle. It has not proved that there is any other traffic of material or substantial volume which will be injuriously affected by the new rate, although, upon the hearing before the Commission, the railroad was expressly invited to offer any proof it had that it would suffer injury in this way. Here again the railroad company asks us to take notice and insists that the Commission should have taken notice of facts which cannot be judicially known. As to many of the interior points where distilleries are located and where the Commission's order takes direct effect, or where a similar order will take direct effect, it affirmatively appears that there is no substantial traffic in grain, excepting to these distilleries. A few of the distilleries, however, are in towns or cities of considerable size, and, in the nature of things, there must be some such traffic to mills or to feed stores, etc., and some outbound shipment of locally grown grain from these points; but that this traffic, which perhaps we must presume has some existence, is large enough to be worth any attention or to merit the granting of an extraordinary remedy, or indeed to give jurisdiction to this court, does not appear and cannot be assumed.

[6] It does appear by the map that the most distant of the distillery points to be affected are about 90 miles southerly from Cincinnati, and 75 miles southeasterly from Louisville, and if proportionate reductions, on all grain to or from Cincinnati or Louisville and all points intermediate between those cities and the extreme interior distilleries, are eventually compelled under the long and short haul clause of the Kentucky law, it is clear that some additional traffic in grain will be affected; but here again we are left without any evidence, and we cannot set aside the Commission's order upon the mere surmise or even probability that there will be a considerable amount of such traffic, and the further surmise that the induced return traffic will not be as profitable as distilleries' products. Further, if it is true that the new rate is unremunerative, and that the order compelling the application of that rate to all grain at the distillery points has resulted only from the railroad's mistaken omission to prove its case, we cannot assume

that the Railroad Commission would decline to excuse the railroad from the effect of the long and short haul clause. It apparently would have full power to grant such exemption. L. & N. R. Co. v. Eubank, 184 U. S. 27, 22 Sup. Ct. 277, 46 L. Ed. 416.

It follows that there was not, upon the hearing before the Commission, an entire failure of substantial proof to support the order which the Commission made, and that the order cannot, for that cause, be set aside. The rightfulness of this result is emphasized when we consider the conduct of the railroad at the hearing before the Commission. It was given ample opportunity to produce any proof which it desired, but it deliberately elected to stand upon the supposed inefficiency of the attack on its existing rates, and declined to exert itself to show that they were reasonable or that, if the proposed new rates were put in force, it would suffer any loss of revenue to which it was reasonably entitled. Under such circumstances, the railroad has scant equity in asking relief from the result of its carefully chosen course.

[7] For the reasons which we have stated, we think proper to take up, as if for the first time, the attack upon the reparation order; all the necessary parties being now before the court. The power of the Commission to make a reparation award which should be in effect a money judgment was left untouched by our previous opinion and by the Supreme Court. Many, perhaps all, of the mooted points have been decided adversely to the railroad's position, by the Kentucky Court of Appeals, in Illinois Central R. R. Co. v. Paducah Co., 163 S. W. 239, February 10, 1914. In so far as this decision is a construction of the state statutes, it is obligatory upon us. It is not entirely clear to us how, if the award is a judicial act, it can be sustained against the provisions of the Constitution of 1891, on the theory that this Constitution preserved the existing powers of the Railroad Commission, when the supposed power was (except for one provision) equally obnoxious to the Constitution of 1850; but perhaps the Kentucky Court of Appeals would make that clear, if its attention was directed to the question. It may be, also, that its recent opinion should be considered as really holding that the award is not a judgment, but only prima facie evidence to be used in the subsequent judicial proceeding.

[8] Whatever may be the right conclusion upon this subject as well as upon others involved in the present attack upon this reparation order, we have concluded that, with the effect of the future rate removed as a basis for equitable relief, there is, in the reparation order itself, however invalid it might be, no sufficient reason for an injunction. The order directs the payment of specifically named sums to 19 separate distilleries. If there were to be 19 separate suits scattered through the various counties where the distilleries are situated for the recovery of these sums, we might think that the prosecution of such a multiplicity of suits should be enjoined. However, we are assured by the counsel for the Railroad Commission and all these claimants that they intend to bring upon this award only one suit, either a combination suit upon the joint and several award or a suit upon one claim, to be prosecuted as a test case, or a consolidated suit, according as they

may decide. There is no reason why we should not accept this assurance and base thereon our present action. If this is done, the railroad will not be harassed by many suits in many different places; it can present, in defense, every objection which it now makes, and if, by the construction which the courts of Kentucky give to the statutes of the state, the railroad is deprived of any right which it has under the laws or Constitution of the United States, it can secure that right by the aid of the Supreme Court of the United States. Under these circumstances, we are not inclined to enjoin the Railroad Commission or the parties in interest from proceeding in the Kentucky courts according to the form of the Kentucky law; and the motion for such injunction is denied.

[9] Upon the hearing of the former motion, we continued, pending review in the Supreme Court, an order restraining the enforcement of the new rate, and we did this on condition that the railroad company should pay into court, month by month, all the freight charges which it had collected in excess of the rates fixed by the Commission order in question. Our order provided:

"Such money paid into court and subsequent similar payments shall be refunded to the parties paying the excess respectively, if it shall finally be determined that such excess was not lawfully collected, otherwise to be returned to the complainant."

This order was made January 12, 1911. Under its terms while the appeal was pending in the Supreme Court, a considerable sum has accumulated. The distillers who paid the freight charges covering these excess amounts so paid into court, and who have now been made parties to this case, move for an order that this fund be distributed and returned to them. We do not see how this can be done. It might have been better if our former order had provided for repayment of these amounts if it should "finally be determined that the restraining order was improvidently issued"; but this was not the form of the order. The language which was used provided that the fund should remain in court until the question of the lawfulness of the rate "shall finally be determined." There cannot be a final determination except by final decree; and that has not come. We could set aside or modify this order as to its further effect, but we cannot change what has been done, because the railroad has paid these sums into court upon the condition specified in the order, and it is entitled to the observance of that condition. The motion for distribution is denied.

[10] We assume that the railroad company will wish to make another effort to get the Supreme Court to pass upon the question of the supposed lack of evidence before the Commission and will accordingly appeal from the order to be entered upon this opinion. This raises the question whether we should again continue the restraining order pending this second appeal. We are not inclined to do so. If the new rate goes into effect pending this appeal, the railroad company will lose some money, and the loss will be practically irreparable, but the amount will not be very large, and we think that to impose that possible loss is a less evil than to permit the railroad company to have

longer benefit of the restraining order as the result of its own mistake in presenting its case the first time. This present record can be taken to the Supreme Court in a very few days, and if that court thinks the railroad company should have an injunction under the practice which it followed in Omaha Co. v. I. C. C., 222 U. S. 582, 32 Sup. Ct. 833, 56 L. Ed. 324, it can speedily give that relief.

The existing restraining order will be continued only for the few days necessary for the railroad to notify its agents that the new rate must be applied, and will then be dissolved.