PENNSYLVANIA CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION et al., Interveners).

(District Court, W. D. Pennsylvania. May Term, 1914.)

No. 36.

CARRIERS (§ 33*)—INTERSTATE CARRIERS—SWITCHING FACILITIES—DISCRIMINATION.

Complainant, an interstate carrier, had terminal facilities within the switching district of N., owning depots, freight stations, yards, team tracks, and tracks connecting with and running into numerous separate industries located along or connected with its facilities and other railroads. Within such district there was also physical connection between complainant's tracks and those of the B. & O. R. Co. over the tracks of which the B., R. & P. R. Co. operated trains into N. from B. Complainant company had been in the habit of receiving cars tendered to it by the B. & O. and other railroads at junction points within the switching limits of N. and transporting them to industries on its lines within the city for the uniform charge of $2 per car and would transport cars from industries on its lines in N. to junction points with the carriers other than the B., R. & P. Co. for a similar charge. Held, that the right of the B., R. & P. Co. to a similar service over complainant's lines did not involve the use of complainant's tracks and terminal facilities by the B., R. & P. Co., but was a right to equal facilities without discrimination to which the company was entitled under Interstate Commerce Act (Act Feb. 4, 1887, c. 104, § 3, 24 Stat. 380 [U. S. Comp. St. 1901, p. 3155]), requiring every carrier to afford reasonable and equal facilities for the interchange of traffic between their respective lines, etc.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. § 33.*]

Buffington, Circuit Judge, dissenting.

In Equity. Suit by the Pennsylvania Company against the United States, in which the Interstate Commerce Commission and the Buffalo, Rochester & Pittsburgh Railway Company intervene. On motion for preliminary injunction. Denied.

Upon motion for interlocutory injunction. The Pennsylvania Company asks the court for an order to restrain the United States from undertaking to enforce an order made by the Interstate Commerce Commission in a proceeding between the Buffalo, Rochester & Pittsburgh Railway Company and the Pennsylvania Company, which requires the Pennsylvania Company to cease from continuing certain acts found by the Commission to be unduly and unreasonably prejudicial as against the Buffalo, Rochester & Pittsburgh Railway Company. The United States and the Interstate Commerce Commission resist the application; so does the intervening carrier.

The Pennsylvania Company is engaged in the transportation of property by railroad between points in Pennsylvania and New York. The Buffalo, Rochester & Pittsburgh Company extends from Rochester, N. Y., and from Buffalo, N. Y., into Pennsylvania to a place known as Butler, about 40 miles from New Castle, Pa., and the Buffalo, Rochester & Pittsburgh Company transports freight from a further line of railroad from Butler to New Castle under a trackage agreement with the Baltimore & Ohio Railroad Company, and operates its line in competition with the Pennsylvania line.

New Castle is a city of 40,000 people, situated about 50 miles north of Pittsburgh. The Pennsylvania Company has terminal facilities within the switching district of New Castle, and owns depots, freight stations, yards, team tracks, and tracks connecting with and running into numerous separate in-

dustries located along or connected with the Pennsylvania's facilities. Much traffic is handled by the Pennsylvania Company within the switching district.

New Castle is reached and served by the Pennsylvania, Pittsburgh & Lake Erie, the Erie, and the Baltimore & Ohio railroads. The Buffalo, Rochester & Pittsburgh Company, jointly with the Baltimore & Ohio, operates certain lines of track between Butler and New Castle, and since 1899 has operated its freight trains into New Castle. The terminal facilities of the Pennsylvania in New Castle consist of depots, freight stations, tracks, spurs, and side tracks aggregating about 24 miles, with switching limits at New Castle extending in the direction of their greatest length for a distance of about four miles, within which there are more than 100 industries served by the Pennsylvania Company, or by the Buffalo, Rochester & Pittsburgh Company, or by other carriers. Near the center of the city at Moravia street, and at one other point a mile and a quarter from Moravia street, a physical contract and connection occurs between the tracks of the Pennsylvania Company and those used by the Buffalo, Rochester & Pittsburgh Company; at the latter point there are ample facilities for the interchange of car load freight, and at the former the Pennsylvania Company has interchange yards with a capacity for 250 cars. The Pennsylvania Company receives cars tendered to it by the Pittsburgh & Lake Erie, the Erie, and the Baltimore & Ohio, at junction points within the switching limits of New Castle, and transports them to industries on its lines within the city for a uniform charge of $2 per car, and will transport cars from industries on its line in New Castle to junction points with the three carriers just named for a similar charge. Industries on the tracks of the Pennsylvania Company within the switching limits, which receive car load freight transported by the Buffalo, Rochester & Pittsburgh, or which desire to ship over its lines to points beyond New Castle, must dray their traffic from or to that company's yards to great disadvantage to themselves. The Pennsylvania Company refuses to transport cars within the switching limits tendered by the Buffalo, Rochester & Pittsburgh Company to it at either junction point in New Castle, or to transport cars from industries on its line within the switching limits to the junction points on the lines of the Buffalo, Rochester & Pittsburgh for transportation by it beyond. It avers that the average distance from one of the points of physical connection to all of the industrial tracks operated or served by the Pennsylvania Company therefrom is less than a mile, and from the other point of physical connection the average distances of the various industrial tracks are slightly greater. The tariffs of the Pennsylvania Company name 128 industries within the switching limits and the immediate vicinity of New Castle from and to which car load shipments are transported by the Pennsylvania Company and certain other carriers at switching charges named therein.

The Interstate Commerce Commission found that the Baltimore & Ohio renders less service for the Pennsylvania Company than that company performs for it, and that it appeared that, at several points in the Shenango and Mahoning Valleys of Pennsylvania and Ohio, reciprocal switching arrangements are in effect, and that the total amount of switching secured by the Pennsylvania Company was greater than that performed by it for the valleys, including New Castle, and for New Castle proper. The Commission also considered the contention of the Pennsylvania Company that the three carriers hereinbefore named, other than the Buffalo, Rochester, & Pittsburgh Company, were in a position, either at New Castle or elsewhere, to offer reciprocal advantages to the Pennsylvania Company for the switching done for it in New Castle, while the Buffalo, Rochester & Pittsburgh was not in a position to offer similar advantages by way of compensation at New Castle or elsewhere. The Commission, however, found that car load shipments transported to New Castle by the Baltimore & Ohio or by the Buffalo, Rochester & Pittsburgh arrive at New Castle from Butler and beyond under similar circumstances and conditions; the Commission saying that, if the cars are hauled to New Castle by a Baltimore & Ohio engine and tendered to the Pennsylvania Company, they will be transported by the Pennsylvania Company to any point within the switching limits for a charge of $2 per car, but that, if similar cars are transported over the same line and to the same point by the Buffalo, Rochester & Pittsburgh, the Pennsylvania refuses to transport them

to any point within the switching limits. The Pennsylvania Company in its bill avers that at one of the points of connection in New Castle all through interstate commerce received from points on the Buffalo, Rochester & Pittsburgh road outside of the switching limits of New Castle and destined to points on the lines of the Pennsylvania Company outside of such switching limits is interchanged, and that it also receives from points on the lines of the Pennsylvania Company, outside of such switching limits, traffic destined to points on the line of the Buffalo, Rochester & Pittsburgh outside of such limits, and affords reasonable and equal facilities, without discrimination in rates or charges, and that the interchange required by the order of the Commission amounts merely to terminal service and delivery, and that, if enforced, will involve the use by the Buffalo, Rochester & Pittsburgh Company of the tracks and terminal facilities of the Pennsylvania Company without its consent.

The Commission held that the practice of the Pennsylvania Company constituted undue and unreasonable discrimination, and made an order to the effect that the Pennsylvania Company should desist from the undue and unreasonable prejudice.

The United States filed an answer, admitting the facts as to the situation, conditions, and methods of operation adopted at New Castle, and found by the Interstate Commerce Commission in its report, but denies that the order of the Commission exceeded authority conferred upon that body.

F. D. McKenney, of Washington, D. C., and Gordon Fisher, A. P. Burgwin, and Dalzell, Fisher & Hawkins, all of Pittsburgh, Pa., for Pennsylvania Co.

E. Lowry Humes, U. S. Atty., of Meadville, Pa., and Blackburn Esterline, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

Joseph W. Folk, of St. Louis, Mo., and Charles W. Needham, of Washington, D. C., for Interstate Commerce Commission.

William A. Glasgow, Jr., of Philadelphia, Pa., for intervening carrier, Buffalo, Rochester & Pittsburgh Co.

Before BUFFINGTON and HUNT, Circuit Judges, and ORR, District Judge.

HUNT, Circuit Judge (after stating the facts as above). The motion for a restraining order was asked upon the premise that, if that portion of section 3 of the act to regulate commerce, which requires that every carrier subject to the provisions of the act shall, according to its respective powers, afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines for receiving, forwarding, and delivering property to and from the several lines and those connected therewith without discriminating in their rates and charges between such connecting lines, stood alone, the Pennsylvania Company would be obliged to perform the service which the Buffalo, Rochester & Pittsburgh Company wishes it to perform, and which the order of the Interstate Commerce Commission says it shall perform. The question, therefore, is whether the additional clause in section 3, forbidding a construction of the language just referred to, which will require any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business, can under the facts avail the Pennsylvania Company.

We hold that it is not a use of the tracks or terminal facilities of the Pennsylvania Company that the Buffalo, Rochester & Pittsburgh

Company seeks for itself, but a service of transportation in receiving and forwarding freight tendered by it to the Pennsylvania Company, a service to be performed upon the payment of a reasonable compensation to the Pennsylvania Company; such compensation to be fixed, of course, in the first instance by that company. The use of the tracks and terminal facilities under the service asked for will be no greater than that which the Pennsylvania Company extends to other carriers which may desire traffic carried. No physical occupancy by running trains or locomotives of the Buffalo Rochester and Pittsburgh Company is asked; there being, as we look at it, only tender of freight at a point of interchange already established by the Pennsylvania Company, and where it receives the cars of every other road except the Buffalo, Rochester & Pittsburgh Company and hauls after delivery. The facts, therefore, take the case from within the scope of the rule of Louisville & N. R. Co. v. Central Stock Yards Co., 212 U. S. 132, 29 Sup. Ct. 246, 53 L. Ed. 441, where the Stock Yards Company demanded that the cars should be received by the Louisville & Nashville at a point which was an arbitrary one, near its terminus.

We have given careful consideration to the argument of counsel for the Pennsylvania Company in their effort to withdraw the case from the rule laid down in Grand Trunk Railway Co. v. Michigan Railroad Commission, 231 U. S. 457, 34 Sup. Ct. 152, 58 L. Ed. 310, but we believe the doctrine of that case controls this. The statute of the state of Michigan which was there examined by the court, in so far as it required interchange of traffic, was quite similar to the provisions of the act to regulate commerce pertinent to this case, for the language of the Michigan law, which required the forwarding and delivering of property, contained a proviso to the effect that nothing in the statute should be construed as requiring any railroad to give the use of its tracks or terminal facilities to another railroad engaged in like business. The extent of the city of Detroit was considered, and necessarily the court was called upon to distinguish the facts in order to demonstrate the inapplicability of its previous ruling in Louisville & Nashville Railroad v. Stock Yards Co., supra, upon which reliance was placed by the railroad company in its effort to prevent the enforcement of the order of the State Commission. The court, however, regarded the effect of the order made by the state Railroad Commission as merely requiring the railroad companies to accept freight at the designated points for shipment to other designated points, and said that, "except in an extreme sense," such an acceptance of freight was not a use of tracks and terminals other than in the sense of being only a proper use for which the roads were constituted to afford. So, upon the principle that the order made was a regulation of the business of a carrier and not an appropriation of terminal facilities for the use and benefit of other roads, it was sustained.

The underlying principle is that a common carrier may be required to accept a car for transportation whenever such a car is offered at a place where the common carrier has established a point of interchange, provided always a reasonable compensation is fixed for the service. Here, the place where the cars are offered not being an arbitrary one,

the carrier Pennsylvania Company may not inquire into the ownership of the car, nor into the route over which it has been moved to reach its rails merely to decide whether or not it will transport the car so offered. To hold otherwise would greatly diminish the regulating power of the Interstate Commerce Commission to treat all carriers as within the letter of the act to regulate commerce with respect to their duties to transport. It follows that, where compensation is offered, a practice of hauling the cars of several connecting carriers and absolutely refusing to haul the cars of another carrier is a discrimination which, in the interests of the public, may be removed as properly within the power of just and reasonable regulation by the Interstate Commerce Commission. Interstate Commerce Commission v. Delaware, L. & W. R. Co., 220 U. S. 235, 31 Sup. Ct. 392, 55 L. Ed. 448.

The question of reasonable compensation is in no way involved, and no opinion is passed thereon.

Restraining order must be denied.

BUFFINGTON, Circuit Judge (dissenting). The right of the Interstate Commerce Commission to make the order here involved is statutory. If, therefore, there is no statute thereto enabling, this order should be enjoined as unlawful. Because I regard this order, not only as without enabling legal warrant, but as in violation of that provision of the Constitution (art. 5) which provides that "no person shall * * * be deprived of * * * property, without due process of law, nor shall private property be taken for public use, without just compensation," I am constrained to record this dissent.

Warrant, if any, for this order must be found in section 3 of the act of February 4, 1887, hereafter quoted, and the question here involved is: Does this order require the Pennsylvania Lines to give the use of its terminal facilities to another carrier engaged in like business? If it does, it is unlawful. That this dispute involves terminal facilities is established by the findings of the Commission, 29 Interst. Com. Com'n R. 114, to the effect that "the terminal facilities of the defendant in New Castle consist of depots, freight stations, yards, team tracks, and side tracks, together with spur tracks reaching 26 industries within the switching limits." That terminal facilities were excluded from the operation of this statute has, in the past, been the heretofore recognized usage of the Commission. In Morris v. Baltimore & Ohio R. R. Co., 26 Interst. Com. Com'n R. 240, it is said:

"The purpose of these complainants is simply to obtain access by a purely switching movement from their industries located upon the terminals of the Frederick Railroad to and from the Baltimore & Ohio and the Pennsylvania Company. * * * To order these defendants to receive and switch cars which have been transported to Frederick over the lines of their rivals would apparently be to require them, within the meaning of the act, to open up their terminals to their competitors, *and this is forbidden.* We are therefore obliged to hold in the present case that we have no authority to grant this reasonable request of the complainants. * * * All that we now decide is that these railroads cannot be required to open their terminals * * * to traffic brought to and carried from that locality by their competitors."

214 F.—29

And this position was taken for sound practical reasons, for as stated by that body in Cardiff v. C. M. Co., 13 Interst. Com. Com'n R. 460, where, referring to "that part of section 3 of the act which provides that no carrier shall be required to give the use of its tracks and terminal facilities to another carrier engaged in like business," it was said:

"Without some such provision in the law, or some such general understanding of the essential injustice involved, adventurous capital would not be slow in paralleling the great trunk lines and in demanding a connection that would give them the use of trunk line terminals."

We turn now to the facts of this case, and see whether they are such as call for the application of the recognized usage of the Commission. The facts of the present case are these:

The city of New Castle, Pa., is the center of the great iron, steel, and ore section known as the "Mahoning and Shenango Valleys." Four large railroad systems serve the industries in this section. New Castle alone has 128 of these manufacturing plants, and to 26 of these plants the Pennsylvania has access through its spur tracks from its terminal switching yards. The value of the switching terminal yards of the Pennsylvania is shown by the fact that the property on which they are located is worth from $3,000,000 to $5,000,000, the freight received therefrom per year is 450,000 tons, and the revenue from such terminal service and the transportation flowing therefrom is $2,500,000. The other three systems have correspondingly valuable terminal connections and facilities in New Castle and the rest of the Valley. For many years these four great systems, by mutual agreement, have had an interchange of terminal switching, whereby a car transported, or to be transported, on any one of the systems, was switched to or from any such system to a plant located on the switching terminals of the other line. The working of this agreement was such that any plant in the Valley district could consign or receive on its own siding cars of freight transported by any one of these carriers. The extent and value of this great switching interchange to the railroads in preventing duplication and superadding switching terminal facilities is seen by the fact that for the years 1909 to 1911, inclusive, the Erie Road switched for the Pennsylvania 41,029 cars in exchange for 14,891 switched by the latter. The Pittsburgh & Lake Erie switched for the Pennsylvania 49,176 cars in exchange for 39,327 switched by the latter for it. The Baltimore & Ohio switched for the Pennsylvania 22,756 in exchange for 49,493 switched by the latter for it. It will be observed that these figures only show the switching services rendered to and by the Pennsylvania alone, and do not include the cars switched by each of the three other systems for each other. This switching service was rendered by express agreement and in consideration of the possession and interchange of switching terminal service and facilities allowed by each system to the other. An arbitrary rate of $2 per car was contracted for, not as a measure of value for the service rendered, but as an arbitrary clearing house basis of accounting. The real value of the service was the reciprocal switching service rendered by these roads to one another.

As a pertinent example of the working of this system and of it's service to the public, we may cite an example: The city of Rochester, N. Y., was connected with New Castle by the Pittsburgh & Lake Erie (New York Central) and the Pennsylvania (Northern Central). A consignor at Rochester could therefore route his car over the Pittsburgh & Lake Erie and have it delivered to a manufacturing plant on the switch terminals of any of the contracting railroads at New Castle or the Valley, or he could route it from Rochester over the Pennsylvania and have it delivered the same way. In addition to using these two systems which directly connected Rochester and New Castle, he would also route his car from Rochester over the Pittsburgh, Rochester & Buffalo road (the vitally interested party in this dispute), which will hereafter be called the Rochester Company. At Butler, Pa., a few miles from New Castle, that road connected with the Baltimore & Ohio, from whence the car could be hauled by the Baltimore & Ohio over its line from Butler to New Castle, where, under this terminal switching arrangement, the car thus transported by the Rochester Company could be delivered at any plant reached by the terminal tracks of the four contracting roads. What we have thus illustrated to show access from Rochester to a terminal siding plant at New Castle, of course, applies where a consignor desired to ship from his plant to Rochester or to any point on the Buffalo, Rochester & Pittsburgh Railroad. Such have been and such are now the terminal and routing facilities enjoyed by the 128 plants in New Castle alone, and by all others in the Shenango and Mahoning Valleys by virtue of this contract between these companies. The service thus rendered by these four contracting companies has been such that we are informed no complaint has been made to the Commission. That agreement is based on the ability of each of the companies to afford corresponding switching service to each of the others through the ownership of great terminal yards and facilities.

To draw from this requited, reciprocal, licensed use by these roads of their terminals the inference that they thereby dedicated their terminals to the use of all other roads is not only to lose sight of the actual facts, but it tends to undermine, discourage, and stop the broad-minded policy of encouraging railroads possessing terminal facilities to contract for such reciprocal interchange as benefit communities, shippers, and carriers alike. To call this arrangement virtually a general dedication, and to liken it to the situation in Grand Trunk v. Michigan, 231 U. S. 473, 34 Sup. Ct. 152, 58 L. Ed. 310, is to lose sight of the real situation here, which is one of a licensed use under contract. The motive which leads railroads to make such contracts is clearly stated by an able railroad executive,[1] who testified:

"The theory back of a reciprocal switching arrangement is this: There are certain railroads which have like terminals in the same general switching district; and that they may be reasonably accommodated they switch for each other. In other words, we permit these railroads to solicit freight over our tracks and have it switched by us to their lines, based on the theory that there is an offset to us elsewhere. * * * It simply comes to what you can afford to do in letting another railroad into your terminals to take your

---

[1] Henry W. Thornton, then division superintendent, and since made general manager, of the London & Great Eastern Railway Company.

business. There isn't any philanthropy about it, and we might as well come out and say it is a business proposition."

And the right to contract for reciprocal switching service has been recognized by the federal courts. In Kentucky v. Louisville (C. C.) 37 Fed. 573, 2 L. R. A. 289, Circuit Judge Jackson, afterwards Justice of the Supreme Court, said:

"Now, under this last limitation upon or qualification of the duty of affording all reasonable, proper, and equal facilities for the interchange, or for the receiving, forwarding and delivering of traffic to and from and between connecting lines, it is clearly left open to any common carrier to contract or enter into arrangements for the use of its tracks and terminal facilities with one or more connecting lines, without subjecting itself to the charge of giving an undue or unreasonable preference or advantage to such lines, or of discriminating against other carriers who are not parties to, or included in, such arrangements. No common carrier can therefore justly complain of another that it is not allowed the use of that other's tracks and terminal facilities upon * * * like terms and conditions which, under private contract or arrangement, are conceded to other lines."

In Little Rock v. St. Louis, 63 Fed. 775, 11 C. C. A. 417, 26 L. R. A. 192, the Circuit Court of Appeals of the Eighth Circuit said:

"A railroad having equal facilities at a given point for forming a physical connection with a number of connecting carriers might find it exceedingly beneficial to enter into an arrangement with one of them, having a long line and important connections, for through billing and rating, and for the use of each other's cars and terminal facilities, while it would find it exceedingly undesirable and unprofitable to enter into a similar arrangement with a shorter road, which could offer nothing in return."

In Petition of Philadelphia, etc., Co., 203 Pa. 354, 53 Atl. 191, the Supreme Court of that state clearly points out the quasi private nature of terminal property, saying:

"The only effect of this act is to transfer the property of one private corporation to a new one, for the same public use, both being transporters of passengers for profit. The transaction is not, in substance, different from the transfer of one farmer's land to his neighbor, under an assumed right of eminent domain, which has not the shadow of warrant in the Constitution. To illustrate, let us suppose another case, which, if this claim be sustained, might easily become a real one: The Pennsylvania, Philadelphia & Reading, and Baltimore & Ohio are all steam railroads for passenger and freight traffic entering the city of Philadelphia, with terminal stations near its center. For five miles and more each has, at immense expense, through years of enterprise, built up a very large and probably remunerative traffic on the few miles of road next their terminal stations. Suppose another road or roads organized, as they may and can easily be, under the general railroad law of 1868, with an eastern terminal at Philadelphia; they can approach to within a few miles of the city without serious difficulty, but the cost of entering, by reason of the very great value of property, would necessarily be very large. Would the Legislature, under the assumed right of eminent domain, pass an amendment to the act of 1868 authorizing the new company to take possession jointly with the old company of five miles of the older company's tracks, that it might for the benefit of the public secure an entrance into the city? Of course, there would have to be some proceeding adopted for assessing and paying the damage to the older company; but how estimate the damage? * * * It is obvious that such an amendment would not be founded on any necessity of, or even convenience to, the general public, but on the desire of and the temptation to the new company, from a business point of view, to take possession of the franchise and property of the old one, a desire which could only be obtained by the assumed exercise of the power of eminent domain in

favor of the new corporation by the state. It would be perversion of, or a tyrannical exercise of, the power of eminent domain by the sovereign, not for a public use, but for the private and corporate gain of the new organization."

In Louisville v. Central Stockyards Co., 212 U. S. 132, 29 Sup. Ct. 246, 53 L. Ed. 441, the Supreme Court, using in that connection, the words "arbitrary point near its terminus" to distinguish such point from a terminal station, said:

"There remains for consideration only the third division of the judgment, which requires the plaintiff in error to receive at the connecting point, and to switch, transport, and deliver, all live stock consigned from the Central Stockyard to any one at the Bourbon Stockyards. This also is based upon the sections of the Constitution that have been quoted. If the principle is sound, every road into Louisville, by making a physical connection with the Louisville & Nashville, can get the use of its costly terminals and make it do the switching necessary to that end, upon simply paying for the service of carriage. The duty of a carrier to accept goods tendered at its station does not extend to the acceptance of cars offered to it at an arbitrary point near its terminus by a competing road, for the purpose of reaching and using its terminal station. To require such an acceptance from a railroad is to take its property in a very effective sense, and cannot be justified, unless the railroad holds that property subject to greater liabilities than those incident to its calling alone."

These decisions recognize that there is such a thing as the quasi private property of a railroad, which a covetous competing road is bound to respect. Indeed, the common sense of the subject is aptly summed up in a public address made by one of the best versed railway thinkers[2] of the country, where, in an extract printed in defendant's brief, he says:

"The terminal problem overshadows almost every problem. Terminals are of as much importance to a railroad as hands and feet are to an individual. Each railroad must build and use its own terminals. If railroad terminals were pooled, all developments would be at a standstill. No one would build terminals. To open all railroad terminals to common use would be running a railroad like a hotel. The proposition on its face is impossible, and would lead to dire consequences."

And the distinctive character of such terminal facilities was recognized by Congress in the act here involved. In that statute (section 3, Act of Feb. 4, 1887), while it was enacted that:

"It shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular description of traffic in any respect whatever, or to subject any particular person, company, firm, corporation or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatever. Every common carrier subject to the provisions of this act shall, according to their respective powers afford all reasonable, proper, and equal facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivering of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in their rates and charges between such connecting lines"

---

[2] James J. Hill.

—Congress added:

"But this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another. carrier engaged in like business."

By this proviso it is clear that courts were forbidden to construe this act so as to require carriers to do two things: One was "to give the use of its tracks  *  *  *  to another carrier engaged in like business." The second was "to give the use of its  *  *  *  terminal facilities to another carrier engaged in like business." And this brings us face to face with the narrow question of fact on which this case turns, and that is: Is the Interstate Commerce Commission by its order in this case "requiring any common carrier" (to wit, the Pennsylvania lines) "to give the use of its  *  *  *  terminal facilities" (to wit, its terminal switching facilities at New Castle) "to another carrier" (to wit, the Buffalo, Rochester & Pittsburgh Railroad) "engaged in like business"? That the two railroads are engaged in like business goes without saying; that the subject-matter of this order is the terminal facilities of the Pennsylvania at New Castle, worth several millions of dollars, was, as we have seen, found by the Commission. Such being the case, it is clear that such order is in violation of the statute unless the word "use"—"the use of its terminal facilities"— is not given by this order to the Rochester Company. This great statute, beneficial alike in the powers created under one clause and the powers excluded under the other, is not to be subjected to word whittling. It was conferring broad traffic exchange between lines on one hand, and conserving great terminal facilities on the other. Congress was well aware that executive encroachment or judicial construction might give an effect to the law that the legislative branch never meant. Accordingly it left no room for construction in this clause. In clear and simple words, of common English speech, it said that this statute "shall not be construed as requiring any such common carrier to give the use  *  *  *  of its terminal facilities to another carrier." Can there be any doubt what these words meant? Without analyzing what the Rochester Company gets under this order, will any one say that the Pennsylvania is enjoying the same use of its terminal facilities at New Castle that it did before the order was made? By virtue of this order, in effect and substance, the Pennsylvania lines must, on a demand by the Rochester Company, as a right, now take its locomotive to the point of physical connection with the Rochester Company, and haul its car over its terminal switching tracks to a manufacturing plant siding, and switch such car back, and return such car to its competitor loaded with freight naturally and equitably tributary to its own line. To say that this is not "requiring any such common carrier to give the use of its  *  *  *  terminal facilities to another carrier" can only be met by the maxim, "Res ipsa loquitur."

Passing by the question whether the order is justified, the fact—the physical fact—is clear, that the servitude imposed by it is, to the extent the servitude is exercised, not only a use of the property but a taking and appropriation. "To require such an acceptance from a railroad," says the Supreme Court in 212 U. S. 132, 29 Sup. Ct. 246, 53 L. Ed.

441, supra, "is to take its property in a very effective sense." And again in Pumpelly v. Green Bay, 13 Wall. 166, 20 L. Ed. 557, that court said:

"It is not necessary that property should be absolutely taken, in tne narrowest sense of the word, to bring the case within the * * * constitutional prohibition; but there may be such serious interruption to the common and necessary use of property as will be equivalent to taking, within the meaning of the" amendment.

But to our judgment, not only has this terminal property been illegally taken, but it will be further noted that the effort of the Rochester Company to secure the use of these terminals is not to answer any public need, but simply to make private gain. As we have seen, any shipper to or from any siding connected with the New Castle terminals of the Pennsylvania can now, and for ten years past could, route cars over the Baltimore & Ohio to Butler to or from any point on the Rochester Company lines. So that due service has been afforded the public on the line of the Rochester Company through the Baltimore & Ohio. By an operative contract the Baltimore & Ohio now permits the Rochester Company to run its engines, cars, and trains over the Baltimore & Ohio tracks from Butler to New Castle. In the ten years this license has been used the Rochester Company has only gotten but three industries tributary to its terminal property in New Castle. It has no reciprocal terminal switching facilities or freight-producing manufacturing advantages, either in New Castle or the Valleys to offer the Pennsylvania in exchange for the use of the latter's terminals. The order it has obtained will be of great strategic and financial gain to the Rochester Company, but it will not give the shipper on the Rochester line access to any point he does not already have under existing tariffs. I think the case is one that calls for plain speaking. Bared to nakedness, the facts show that the Rochester Company simply coveted and desired its neighbor's property, and to make this covetous purpose effective it seeks to violate, not only the act of Congress, which says, "But this shall not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business," but that constitutional provision which in effect but restates another of the decalogue when it provides, "Nor shall private property be taken for public use without just compensation." In this effort to seek private gain under the guise of public good, this railroad has, I take it, invoked the aid of the Interstate Commerce Commission contrary to its heretofore expressed practice.

Holding, then, that the Commission has failed to comply with the requirement of the act in question, in that its order requires one common carrier to give the use of its terminal facilities to another carrier engaged in like business, its order is, in my judgment, invalid, as being without statutory warrant and violative of constitutionally guaranteed rights. I am therefore constrained to record this my dissent.