LOUISVILLE & N. R. CO. et al. v. UNITED STATES et al.

(District Court, M. D. Tennessee, Nashville Division. September 1, 1914.)

No. 21.

1. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDERS.

On an investigation into the reasonableness of rates by the Interstate Commerce Commission, if upon the facts found its conclusion therefrom plainly involves an error of law, as where it rests under the undisputed facts upon an erroneous construction of the act to regulate commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), an order made by the Commission, based on such error of law, is subject to judicial review; but the question of the reasonableness of a rate is one of fact, and the conclusion of fact of the Commission that a given rate is reasonable or unreasonable will not be reviewed on the weight of the evidence, unless either there is no substantial evidence supporting such conclusion or it is contrary to the indisputable character of the evidence.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

2. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDERS.

Where the party complaining of an order of the Interstate Commerce Commission does not exhibit to the court the evidence taken by the Commission, but in lieu thereof insists that the facts found by it are insufficient to support its conclusion as to the reasonableness or unreasonableness of a given rate, such conclusion should be accepted by the court as final, unless it appears, not only that the Commission undertook to em-

body in such findings all the material facts established by the evidence, but in addition either that the evidential facts so found furnish no substantial support to such conclusion, or that the conclusion is contrary to the indisputable character of such evidential facts.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

**3. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDERS.**

In determining whether the conclusion of the Interstate Commerce Commission as to the reasonableness or unreasonableness of a rate is supported by substantial evidence, the court does not consider the wisdom or expediency of the order based thereon, or whether on like testimony it would have made a similar ruling; nor does the validity of an order made by the Commission depend upon the correctness of each of its separate findings, the question being whether there was substantial evidence to support the order.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

**4. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—REVIEW OF ORDERS.**

In rate-making cases the weight to be given to evidence relating to rates which the carrier insists had been enforced by competition is peculiarly a matter for the Interstate Commerce Commission, and in general, as the matter of fixing reasonable rates has been committed to the Commission, the courts, which have not been vested with any such power, cannot interfere with the rates fixed by the Commission, unless it is plainly made to appear that the orders are void.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

**5. COMMERCE (§ 98*)—INTERSTATE COMMERCE COMMISSION—ORDERS FIXING RATES—VALIDITY.**

The evidential facts set forth in the report of the Interstate Commerce Commission, on which an order fixing new rates was based, when considered as a whole, *held* to afford substantial support to its conclusion that the old rates were unreasonable and that the new rates are reasonable.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148; Dec. Dig. § 98.*]

**6. CARRIERS (§ 32*)—INTERSTATE COMMERCE COMMISSION—ORDERS RESPECTING SWITCHING PRACTICE—VALIDITY.**

The conclusion of the Interstate Commerce Commission that the switching practice of defendant railroad companies at Nashville, Tenn., in refusing to switch cars of coal to or from the tracks of a third company, except at prohibitive rates, while switching to and from the tracks of each other at a much lower rate, was unjustly and unduly discriminatory, *held* substantially supported by the facts set forth in the report of the Commission, considered as a whole, and an order requiring defendants to establish and maintain the same practice permitting the interswitching of coal to and from the tracks of such third company, as between the tracks of each other, *held* valid.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. § 32.*]

In Equity. Suit by the Louisville & Nashville Railroad Company and the Nashville, Chattanooga & St. Louis Railway against the United States and others. On motion for preliminary injunction Denied.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

John Bell Keeble, of Nashville, Tenn., and Wm. A. Colston and Wm. A. Northcutt, both of Louisville, Ky., for petitioner Louisville & N. R. Co.

Claude Waller, of Nashville, Tenn., for petitioner Nashville, C. & St. L. Ry. Co.

Blackburn Esterline, Asst. Atty. Gen., and A. M. Tillman and Lee Douglas, U. S. Atty., both of Nashville, Tenn., for the United States.

Chas. W. Needham, of Washington, D. C. (Joseph W. Folk, of St. Louis, Mo., on the brief), for Interstate Commerce Commission.

A. G. Ewing, Jr., of Nashville, Tenn., for intervener City of Nashville.

T. J. McMorrough, of Nashville, Tenn., for intervener Davidson County.

T. M. Henderson and F. M. Garard, both of Nashville, Tenn., for intervener Traffic Bureau of Nashville.

Before WARRINGTON, Circuit Judge, and McCALL and SANFORD, District Judges.

PER CURIAM.   The Louisville & Nashville Railroad Co. and the Nashville, Chattanooga & St. Louis Railway, hereinafter called the Louisville & Nashville Railroad and Nashville & Chattanooga Railway, respectively, having filed herein a petition against the United States of America to set aside certain orders made by the Interstate Commerce Commission in reference to rates for the interstate transportation of coal to Nashville, Tennessee, and the switching of interstate shipments of coal at Nashville, moved for an interlocutory injunction restraining the enforcement of these orders pendente lite; which motion was heard by three judges, as provided by the Urgency Deficiency Act of October 22, 1913, c. 32, 38 Stat. 220.   The hearing was had upon the petition, the answers of the United States, and of the Commission, the City of Nashville, Davidson County, Tennessee, and the Traffic Bureau of Nashville, who intervened as defendants, under section 212 of the Judicial Code (Act March 3, 1911, c. 231, 36 Stat. 1150 [U. S. Comp. St. Supp. 1911, p. 219]), and affidavits filed by the petitioners.

The orders sought to be enjoined were made by the Commission in proceedings instituted on the complaint of the Traffic Bureau of Nashville against the petitioners and the Illinois Central Railroad Co. and the Tennessee Central Railroad Co., hereinafter called the Illinois Central Railroad and the Tennessee Central Railroad, respectively, alleging, among other things, that the rate of $1.00 per ton then charged by the petitioners for the interstate transportation of coal to Nashville from certain points in Kentucky, Tennessee and Alabama were unjust and unreasonable, and that certain switching practices of the petitioners at Nashville subjected the interstate traffic in coal to undue and unreasonable prejudice and disadvantage.   Answers having been filed and evidence taken, the Commission made its written report, containing its findings of fact and conclusions thereon (Traffic Bureau of Nashville v. Louisville & Nashville Railroad, 28 Interst. Com. Com'n R. 533), and issued an order making such find-

ings and conclusions a part thereof, and, in accordance therewith, requiring that the Louisville & Nashville Railroad should, for not less than two years, cease from charging its then rates for the transportation of coal to Nashville from mines in Western Kentucky on its Owensboro and Henderson Divisions, and should establish and maintain rates thereon not exceeding 80 cents per ton; that the Nashville & Chattanooga Railway should, for a like period, cease from charging its then rates for the transportation of coal to Nashville from mines on its road in Alabama and Tennessee, through Alabama, and should establish and maintain rates thereon not exceeding 90 cents per ton; and that each of said companies should, for a like period, abstain from their then practice with respect to interswitching interstate carload shipments of coal at Nashville and from maintaining any different practice with respect to switching such shipments from and to the tracks of the Tennessee Central Railroad from that maintained with respect to similar shipments from and to their respective tracks, and should establish and maintain a practice permitting the interswitching of such shipments from and to the lines of each and every defendant.

The petitioners did not file the transcript of the record before the Commission, and do not insist, for the purposes of the motion, that the facts found by the Commission were either without substantial evidence to support them or contrary to the indisputable character of the evidence. The sole grounds of the motion for the interlocutory injunction are: (1) That the facts found by the Commission do not as a matter of law support the orders made by it; (2) that the Commission was without jurisdiction to make the orders; and (3) that the enforcement of the orders made by the Commission will result in the taking of petitioners' property without due process of law and in violation of the Fifth Amendment of the Constitution of the United States.

The petitioners furthermore state explicitly in their brief that in determining these issues the findings of fact made by the Commission in its report will be assumed to be "undisputed," but that they "contend that these findings of fact do not as a matter of law support the conclusions (and) the orders of the Commission complained of, and that the Commission was without jurisdiction to make the orders."

*Order Fixing Rates.* The report of the Commission set forth the geographical location of the various points involved under the rates in question, with the distances and routes of transportation between them, showing that the average distance to Nashville from Western Kentucky mines on the Louisville & Nashville Railroad was 108.5 miles, and from the Eastern Tennessee and Alabama mines on the Nashville & Chattanooga Railway, 140 miles (28 Interst. Com. Com'n R. at page 534). It then stated that the complainant had offered "innumerable exhibits" comparing the Nashville rate, on ton, car and train mile bases, with the rates on coal obtaining north of the Ohio river, the rates to East St. Louis, Louisville and other points on the Ohio and Mississippi river from mines in Kentucky, Tennessee and Virginia, the rates on coal prescribed by the Commission in a number

of cases, the rates on coal to Chattanooga and certain Southeastern destinations, the rates on coal from other mines to Nashville, and the rates on other commodities to Nashville and other destinations, and with the average per ton and per car mile rate received by the defendants and other carriers on all traffic; that "in all of these instances the Nashville rate yields the greatest earnings"; and that the defendants had sought "in elaborate detail" to analyze these comparisons and show that none was of any value in determining the reasonableness of the rates in issue. The report, however, as explicitly stated, did not attempt to set forth the detail into which the parties went in support of their contentions as to the conclusions that might be properly drawn from these exhibits, but stated, generally, that ton-mile statistics are far from infallible guides in fixing freight rates, that per-car earnings, with distance considered, are much more reliable, and that when the commodity moves in trainloads the earnings per train mile furnish the best criterion; that comparison of any kind, however, to be effective must be analogous, or nearly so, the rate charged or gross earnings derived for the transportation of a given commodity between two points furnishing a guide in arriving at the rate to be charged upon the same or nearly the same commodity between two other points similarly situated; that the comparisons made with coal moving to the lakes for transhipment, to tidewater and between points in central freight association territory were of little value because of the manifest difference in transportation conditions; and that as Chattanooga, Knoxville and East St. Louis had coal mines in their immediate vicinities, such juxtaposition of supply and market necessarily exercised a material influence over the rates from more distant mines, thereby lessening the strength of the comparison (28 Interst. Com. Com'n R. at page 535). The report then set forth, among other things, the following facts: That on steam coal the $1.00 per ton rate to Nashville from the Western Kentucky mines on the Louisville & Nashville Railroad had been in effect since 1888, having remained unchanged for 25 years; that the capacity of coal cars used by the Louisville & Nashville Railroad in hauling from these mines to Nashville had in the meantime increased from 16 to 41 tons; that the tractive power of engines had also increased, so that instead of 660 gross tons handled between Guthrie, an intermediate point, and Nashville, in 1888, 1,165 gross tons were then handled, this being significant as tending to reduce the operating cost per unit of freight transported, although the hauling of coal in train loads into Nashville appeared to be the exception rather than the rule; that the volume of the tonnage had also increased from 193,000 tons handled in 1892 to nearly 450,000 tons in 1911; that little more than a suggestion appeared of record as to increased cost of labor and material, and that no attempt had been made to show operating costs; that the Nashville rate from the Western Kentucky mines produced a ton mile revenue of 9.2 mills for an average haul of 108.5 miles; that the Louisville & Nashville Railroad also hauled coal from these same Western Kentucky mines to Memphis, an average distance of 276 miles, for a rate of $1.10,

yielding a per ton mile revenue of slightly less than 4 mills; that the routes from these mines to Memphis and to Nashville were identical as far as Guthrie, Kentucky, a point 216 miles distant from Memphis and 49 miles from Nashville, where the routes diverged, or, "in other words, the Louisville & Nashville charges only 10 cents per ton more when the additional haul beyond Guthrie is 276 (216) miles to Memphis than when it is 49 miles to Nashville"; that while the movement of coal to Memphis may be somewhat heavier than to Nashville there was nothing of record to indicate any substantial dissimilarity in operating conditions from these mines to either market; that the defendants had not undertaken to show any material difference in transportation conditions, but relied entirely upon their contention that the Memphis rate was dictated by water transportation down the Mississippi River from the Pittsburgh mines; that the history of the Memphis rate, which is set out in the report, did not support the theory that it was fixed by water competition, and that, on the whole, the Commission was unable to find any substantial dissimilarity attaching to the transportation of coal from Western Kentucky mines on the Louisville & Nashville Railroad to Memphis and to Nashville, except distance, which was greatly in favor of Nashville; that prior to June, 1913, the Louisville & Nashville Railroad had charged a rate of 60 cents for an average haul of 142 miles, in connection with the Louisville, Henderson & St. Louis Railroad, from the Western Kentucky mines to Louisville, and the Illinois Central Railroad had also charged the same rate for an average haul of 125 miles from these same mines to Louisville, such rate having been, however, advanced to 65 cents subsequent to the submission of the case; that the comparison with this rate was opposed by the defendants on the ground of water competition to Louisville from Pittsburgh and West Virginia mines; that the Commission found, however, that rail-carrier competition was the factor of prime consideration; that the conditions at Louisville were quite similar to those at Memphis, and at neither could they be said substantially to differ from those at Nashville; that while the Commission did not think a relationship in the matter of coal rates between these three cities should be established, a comparison of their rates properly might be drawn, giving some consideration to the fact that coal was actually moving in considerable quantities by water to Louisville, but not permitting it to vitiate the effect of the comparison; that measured by the rates to Memphis and to Louisville, the rate to Nashville was high; that the average loading of cars from the mines in question was 41 tons on the Louisville & Nashville Railroad and 34.5 tons on the Nashville & Chattanooga Railway, the $1.00 rate producing a car revenue of $41.00 in one instance and $34.50 in the other, or per car mile earnings of 37.78 cents and 24.64 cents, respectively; that even if returned empty the car mile revenue for the loaded and empty movement was 18.89 cents and 12.32 cents, respectively, while the average loaded and empty car mile revenue for all traffic during 1912 was 10.54 cents for the Louisville & Nashville Railroad, 10.08 cents for the Nashville & Chattanooga Railway, 7.777

cents for the Illinois Central Railroad and 16.425 cents for the Tennessee Central Railroad; and that the average distance from the mines on the Illinois Central Railroad in the same Western Kentucky fields to Nashville was 167 miles, the coal reaching Nashville over the Tennessee Central Railroad, the rate thereon producing, if loaded at 40 tons per car, a revenue of $40.00 per car, and earnings per loaded car mile of 24 cents, or 12 cents per car mile for the loaded and empty movement, while 34.5 tons to the car would produce a loaded car mile rate of 20.65 cents, or 10.325 cents per car mile loaded and empty (28 Interst. Com. Com'n R. 536–540).

After setting forth the foregoing facts, the report then states the conclusion of the Commission, as follows:

"As to the Louisville & Nashville, we are of opinion and find that the existing rate on coal to Nashville for Western Kentucky mines on its Owensboro and its Henderson divisions is unreasonable. We are of the same opinion and similarly find as to the Nashville, Chattanooga & St. Louis rate from its Tennessee and Alabama mines to Nashville. We further find that reasonable rates to Nashville from the Louisville & Nashville Western Kentucky mines on its Owensboro and its Henderson divisions should not exceed 80 cents per ton, and from the Nashville, Chattanooga & St. Louis mines in Alabama and in Tennessee, the movement from which is through Alabama, 90 cents per ton" (28 Interst. Com. Com'n R. at page 540).

It is earnestly contended by the petitioners that the various evidential facts set forth and found in the report of the Commission, which have been summarized hereinabove, do not, as a matter of law, support its ultimate finding or conclusion, above set forth, as to the unreasonableness of the old rates and the reasonableness of the new rates required; and that, hence, the order of the Commission, based on such erroneous conclusion, is invalid.

This contention obviously involves, in the first place, as its underlying logical foundation, the assumption that the Commission has undertaken to set forth in its report all the evidential facts leading to its ultimate conclusion as to the unreasonableness and reasonableness of such rates, respectively. However, the report affirmatively shows, upon its face, that the Commission did not undertake to set forth the details of the "innumerable exhibits" introduced by the complainant, bearing on the question of the comparison of rates; nor does it recite that the Commission had otherwise undertaken to set forth or find all the facts established by the evidence. It is to be noted in this connection that by section 14 of the Act to Regulate Commerce (Act Feb. 4, 1887, c. 104, 24 Stat. 384 [U. S. Comp. St. 1901, p. 3164]) the report is only required "to state the conclusions of the Commission, together with its decision, order or requirement in the premises," the supplemental provision that the report shall include the findings of fact on which an award is made only applying in case damages are awarded. And in the present case the Commission, after setting forth certain evidential facts, but without purporting to make a complete or detailed finding in regard thereto, stated, in substance, as above set forth, that it "found," as its ultimate conclusion, that the old rates were unreasonable and that the new rates which it required were reasonable.

But even if the report of the Commission had undertaken to set forth and to find all of the evidential facts upon which its ultimate finding or conclusion was based, we are of opinion that its ultimate finding or conclusion of fact as to the reasonableness or unreasonableness of the rates in question does not, upon the evidential facts found, necessarily involve an error of law rendering it invalid.

[1] It is true that if, upon the facts found by the Commission, its conclusion therefrom plainly involves an error of law, as where it rests, under the undisputed facts, upon an erroneous construction of the Act to Regulate Commerce, an order made by the Commission, based upon such error of law, is subject to judicial review. Illinois Railroad v. Interstate Commerce Commission, 206 U. S. 441, 457, 27 Sup. Ct. 700, 51 L. Ed. 1128; Interstate Commission v. Northern Pacific Railway, 216 U. S. 538, 545, 30 Sup. Ct. 417, 54 L. Ed. 608; United States v. Baltimore Railroad, 226 U. S. 14, 18, 33 Sup. Ct. 5, 57 L. Ed. 104; Tap Line Cases, 234 U. S. 1, 26, 34 Sup. Ct. 741, 58 L. Ed. 1185; Los Angeles Switching Case, 234 U. S. 294, 309, 34 Sup. Ct. 814, 58 L. Ed. 1319; Louisiana Railway v. United States (Com. Ct.) 209 Fed. 244. And see Denver Railroad v. Arizona Railroad, 233 U. S. 601–603, 34 Sup. Ct. 691, 58 L. Ed. 1111, as to a ruling of law imported from a general conclusion of facts.

Obviously, however, this rule does not authorize the court to review, as involving an error of law, the conclusion of the Commission upon a question of fact as to the reasonableness or unreasonableness of a given rate, depending upon a consideration of the weight to be given the various evidential facts found by it. The court cannot review the conclusion of the Commission on questions of fact, or substitute its judgment for that of the Commission upon matters of fact within the Commission's province. Interstate Commission v. Delaware Railroad, 220 U. S. 235, 251, 31 Sup. Ct. 392, 55 L. Ed. 448; Los Angeles Switching Case, 234 U. S. 314, 34 Sup. Ct. 814, 58 L. Ed. 1319. The question of the reasonableness of a rate is, however, one of fact. Illinois Railroad v. Interstate Commission, 206 U. S. 455, 27 Sup. Ct. 700, 51 L. Ed. 1128. And accordingly it is well settled that where all the evidence introduced before the Commission is exhibited to the court, its conclusion of fact that a given rate is reasonable or unreasonable, will be accepted by the court as final and not reviewed upon the weight of the evidence, unless either there is no substantial evidence supporting such conclusion or such conclusion is contrary to the indisputable character of the evidence; in which cases the conclusion involves an error of law and is therefore reviewable by the court. Interstate Commission v. Union Pacific Railroad, 222 U. S. 541, 547, 548, 32 Sup. Ct. 108, 56 L. Ed. 308; Interstate Commission v. Louisville Railroad, 227 U. S. 88, 91, 92, 100, 33 Sup. Ct. 185, 57 L. Ed. 431; Florida Line v. United States, 234 U. S. 167, 185, 34 Sup. Ct. 867, 58 L. Ed. 1267.

[2] It necessarily follows that where the party complaining of an order made by the Commission does not exhibit to the court the evidence taken before the Commission, but in lieu thereof, insists that the evidential facts found by the Commission are insufficient to support its conclusion as to the reasonableness or unreasonableness of a given

rate, such conclusion of the Commission should be accepted by the court as final and not reviewable upon the evidential weight of such facts, unless it appears, not only that the Commission undertook to embody in such findings all the material facts established by the evidence, but, in addition, either that the evidential facts so found furnish no substantial support to such conclusion, or that such conclusion is contrary to the indisputable character of such evidential facts; in which cases, the conclusions would involve an error of law reviewable by the court.

[3, 4] Furthermore, in determining whether the conclusion of the Commission is supported by substantial evidence, the court does not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling; and it ascribes to the findings of the Commission, which are made by law prima facie true, "the strength due to the judgments of a tribunal appointed by law and informed by experience." Interstate Commission v. Union Pacific Railroad, 222 U. S. at page 547, 32 Sup. Ct., at page 111, 56 L. Ed. 308. Nor does the validity of an order made by the Commission depend upon the correctness of each of its separate findings as indispensable links in the chain of proof upon which it is based, where the ruling may still be sustained although some of the collateral findings, which, if correct, would be confirmatory thereof, are eliminated; the question being "whether there was substantial evidence to support the order." Interstate Commission v. Louisville Railroad, 227 U. S., at page 98, 33 Sup. Ct., at page 189, 57 L. Ed. 431. And in rate-making cases the weight to be given to evidence relating to rates which the carrier insists had been enforced by competition, is peculiarly a matter for the Commission, "a body experienced in such matters and familiar with the complexities, intricacies and history of rate making in each section of the country." (Id.) And even the prima facie evidential effect of testimony may be sufficient to support the order of a rate-making Commission. Louisville Railroad v. Kentucky Commission (D. C., E. D. Ky.) 214 Fed. 465, 469. And, in general, as the matter of fixing reasonable rates has been committed to the Commission, the courts which have not been vested with any such power, cannot interfere with the rates fixed by the Commission, "unless it is plainly made to appear that those ordered are void." Atchison Railway v. United States, 232 U. S. 199, 221, 34 Sup. Ct. 291, 297, 58 L. Ed. 568. Like considerations must necessarily govern in determining the effect of evidential facts found by the Commission as substantially supporting its conclusions.

[5] Without determining the weight to be given to the many evidential facts set forth in the report of the Commission when separately considered, as, for example, the extent, if any, to which water or rail competition at Memphis or Louisville may properly affect the weight to be given to the rates to such points as a basis for comparison, we are of opinion, after careful consideration, in the light of the foregoing principles, that, even aside from the fact that the Commission does not appear to have undertaken to set forth in its report all the evidential facts upon which its conclusion as to the unreasonableness of the old rates and the reasonableness of the new rate were based, the evidential

facts which it did set forth in its report, when considered as a whole, afford substantial support to its conclusion in this matter; and that such conclusion is not contrary to the indisputable character of such evidential facts and does not necessarily involve any dominating error of law, but merely a determination of the precise evidential weight of such facts, a matter which, there being substantial evidence in support of its conclusion, is entirely within the province of the Commission, and as to which the judgment of the court cannot be substituted. It results that the conclusions of the Commission as to the unreasonableness and reasonableness of the old and new rates, respectively, must now be accepted by the court as final, and that the rate order in question cannot be properly enjoined on the ground that, as a matter of law, it is not supported by the facts found by the Commission.

And the old rates having been determined to be unreasonable and the new rates required to be reasonable, it necessarily follows that the Commission had jurisdiction, under the express provision of section 15 of the Act to Regulate Commerce, to make the order as to rates complained of.

There is furthermore no substantial evidence that the new rates prescribed by the order of the Commission are so low as to be confiscatory and in violation of the constitutional provisions against taking property without due process of law. Interstate Commission v. Union Pacific Railroad, 222 U. S. 547, 32 Sup. Ct. 108, 56 L. Ed. 308; Louisville Railroad v. Siler (C. C.) 186 Fed. 176, 189. And this is, in effect, conceded in petitioners' brief.

So much of the motion for an interlocutory injunction as relates to the order of the Commission in reference to the rates to be charged by the petitioners for the interstate transportation of coal to Nashville must hence be denied.

[6] *Order as to Switching Practices.* The Commission, in its report, set forth the following facts in reference to the Nashville switching situation: That the Louisville & Nashville Terminal Company is a corporation whose entire capital stock is owned by the Louisville & Nashville Railroad and the Nashville & Chattanooga Railway; that the Louisville & Nashville Railroad owns more than 70 per cent. of the capital stock of the Nashville & Chattanooga Railway; that the Terminal Company owns terminal stations at Nashville, with 1.07 miles of main line and 30.32 miles of sidings; that in 1896 the Terminal Company leased all of its property to the Louisville & Nashville Railroad and the Nashville & Chattanooga Railway jointly for 999 years, at an annual rental of 4 per cent. upon the cost, the amount to be paid by each lessee being determined on the basis of use, and the operating expenses of such properties being pro-rated upon the same basis; that both the Louisville & Nashville Railroad and the Nashville & Chattanooga Railway also individually own tracks which they operate independently of each other or of the Terminal Company, and upon which industries are located; that traffic of all kinds is freely interchanged by the Louisville & Nashville Railroad and Nashville & Chattanooga Railway to and from these industries as well as to and from those on the rails of the Terminal Company; that the tariffs of the

Louisville & Nashville Railroad and the Nashville & Chattanooga Railway provide that no charge will be made for switching between their respective lines at Nashville, the expense of this service presumably being absorbed by the line bringing in the traffic; that prior to 1907 neither of these railroads would switch freight of any kind to or from the Tennessee Central Railroad, but in that year, in deference to public opinion, they began switching all non-competitive traffic, *except coal,* to and from the Tennessee Central Railroad, at a charge for this service of $3.00 per car; that under this restricted practice no coal had been interswitched between the Louisville & Nashville Railroad and the Nashville & Chattanooga Railway on the one hand, and the Tennessee Central Railroad on the other; that, although neither the Louisville & Nashville Railroad, nor the Nashville & Chattanooga Railway had ever even considered the switching of coal from the Tennessee Central Railroad, it developed at the hearing that the Nashville & Chattanooga Railway did have an effective rate applicable to interchange with the Tennessee Central Railroad, under which such movement could have been accomplished for 60 cents a ton, which rate, however, was cancelled shortly after the hearing; that while the switching tariff of the Tennessee Central Railroad was similar to those of the Louisville & Nashville Railroad and the Nashville & Chattanooga Railway, its refusal to switch coal from either of the other lines was in reality a retaliatory, measure, and it had, as a cross-complainant, favored the prayer of the complainant; that there was little doubt as to the competitive character of the traffic in coal; and, in short, that the "joint and the separately owned terminals of each of these two defendants are open to all of the traffic of the other; are open to all non-competitive traffic to and from the Tennessee Central except coal, and, up to shortly after the hearing, those of the Nashville, Chattanooga & St. Louis were open as to this coal, but at a prohibitive rate" (28 Interst. Com. Com'n R. 540–542).

After setting forth the foregoing facts and the contentions of the respective parties, the report states the conclusion of the Commission as follows:

"Our conclusion is that the practice of defendants with respect to switching coal at Nashville is unreasonable and unjustly discriminatory; that the present tariff of the Louisville & Nashville and the Nashville, Chattanooga & St. Louis unjustly discriminate against shipments of coal from the Tennessee Central and unduly prefer shipments of coal from the lines each of the other, we find that a just and reasonable practice with respect to switching at Nashville to be observed by all defendants will permit the switching of coal from the interchange of each carrier to industries on the rails of the other" (28 Interst. Com. Com'n R. at page 542).

The order issued by the Commission in accordance with these findings, which is hereinabove set out, provided, in effect, that the petitioners should for not less than two years abstain from their then practice with respect to interswitching car load shipments of coal at Nashville and should establish and maintain the same practice in respect to switching such shipments to and from the tracks of the Tennessee Central Railroad as they might cotemporaneously maintain with respect to similar shipments to and from their own respective tracks.

The determination whether in particular instances there has been an

undue or unreasonable prejudice or preference is a question of fact. Interstate Commission v. Alabama Railway, 168 U. S. 144, 170, 18 Sup. Ct. 45, 42 L. Ed. 414. It necessarily follows that the court in determining whether the conclusions of the Commission as to the discriminatory and preferential practices is supported by the evidential facts set forth in the report, is to be governed by the same considerations as those hereinabove set forth in reference to its conclusion as to the reasonableness or unreasonableness of rates. And, as in the case of rates prescribed by the Commission, the court cannot interfere with practices established by it, "unless it is made plainly to appear that those ordered are void." Atchison Railway v. United States, 232 U. S. at page 221, 34 Sup. Ct., at page 297, 58 L. Ed. 568.

After careful consideration of the evidential facts set forth in the report of the Commission in reference to the switching practice of the petitioners at Nashville, without determining the weight given to such facts, when separately considered, we are of opinion that such facts, when considered as a whole, afford substantial evidence supporting the conclusion of the Commission that such switching practice, which in effect prohibited the interswitching of coal to and from the tracks of the Tennessee Central Railroad, was unreasonably and unjustly discriminatory, that it unjustly discriminated against shipments of coal from the Tennessee Central Railroad and unjustly preferred such shipments from the lines of each other, and that a just and reasonable practice would permit the interswitching of coal from the lines of each of these carriers to industries on the rails of the others; and that such conclusion is not contrary to the indisputable character of the evidential facts set forth, and does not involve, in the determination of their weight, any dominating error of law. And in this connection we are of opinion that the case of United States v. St. Louis Terminal, 224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810, to which the Commission refers in its report, although arising under the Anti-Trust Act, throws, by analogy, a persuasive light upon the discriminatory and preferential character of the practices in question.

It results that the conclusion of the Commission in the matter of the switching practice must now be accepted by the court as final, without substituting its own judgment therefor on the weight of the evidence, and hence that the order in question cannot be properly enjoined on the ground that, as a matter of law, it is not supported by the facts found by the Commission.

And the practice of the petitioners having been determined to be unreasonable and unjustly discriminatory, and the new practice required, to be just and reasonable, it follows, in our opinion, that the Commission had jurisdiction under the express provisions of the Act to Regulate Commerce to make the order as to switching practices complained of. By section 3 of the Act it is made unlawful for any common carrier to give any undue or unreasonable preference or advantage to any particular person, locality or particular description of traffic, in any respect whatsoever, or to subject the same to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; and it is provided that all common carriers "shall afford all reasonable, proper and

equal facilities for the interchange of traffic between their respective lines and for the receiving, forwarding and delivery of passengers and property to and from their several lines and those connecting therewith, and shall not discriminate in the rates and charges between such connecting lines; but this shall not be construed as requiring any such common carrier to give the use of its tracks and terminal facilities to any other carrier engaged in like business." And by section 15 of the Act it is provided that if the Commission, after hearing, shall be of opinion that any rates, charges, regulations or practices whatsoever of any carrier, are "unjust and unreasonable, or unjustly discriminatory, or unduly preferential," it is authorized and empowered to prescribe the just and reasonable rates or charges to be thereafter observed, and the just, fair and reasonable regulation or practice to be thereafter followed, and to order the carrier to desist from such violation.

It is not contended that the order in question requires the petitioners to allow the Tennessee Central Railroad the physical occupancy or use of their tracks or terminal facilities by running its trains or locomotives thereon for the delivery of coal destined to industries along their lines; and obviously its only effect is to require the petitioners to receive cars of coal from the Tennessee Central Railroad at junction points and to switch and deliver the same to industries along their respective lines, in like manner as they receive such cars from one another and switch and deliver the same, upon a just, reasonable and non-prohibitive switching charge, which they may themselves establish, but which shall be the same as they shall respectively make to one another.

We think it clear that this order does not require the petitioners to give the use of their tracks and terminal facilities to the Tennessee Central Railroad, within the meaning of the proviso contained in section 3 of the Act to Regulate Commerce, or constitute an appropriation of such tracks and terminals for the use of the Tennessee Central Railroad, but that it is merely a regulation of the business of the petitioners in the interchange of traffic, within the express authority conferred by the Act. Pennsylvania Company v. United States (D. C.) 214 Fed. 445. This question is in our opinion ruled by the opinion in Grand Trunk Railway v. Michigan Commission, 231 U. S. 457, 468, 34 Sup. Ct. 152, 58 L. Ed. 310, involving the construction of a Michigan Statute similar in its essential respects to the provisions of the Act to Regulate Commerce. Nor is this conclusion at variance with the case of Louisville Railroad v. Stock Yards, 212 U. S. 132, 145, 29 Sup. Ct. 246, 53 L. Ed. 441, which involved the entirely different question of the right to compel a carrier to accept cars "offered to it at arbitrary points near its terminus for the purpose of reaching and using its terminal station." Neither do we find any irreconcilable conflict between the opinion of the Commission in the instant case and that in Waverly Works v. Pennsylvania Railroad, 28 Interst. Com. Com'n R. 621.

There is furthermore no evidence that the switching practices prescribed will violate the constitutional provision against taking property without due process of law. See Grand Trunk Railway v. Michigan Commission, 231 U. S. 468, 34 Sup. Ct. 152, 58 L. Ed. 310. And it

may well be assumed that the petitioners will not themselves establish a switching charge so low as to be confiscatory.

It results that so much of the order of the Commission as relates to switching practices cannot be now enjoined.

An order will accordingly be entered denying the petitioners' motion for an interlocutory injunction.