LOUISVILLE & N. R. CO. et al. v. UNITED STATES et al.*

(District Court, M. D. Tennessee, Nashville Division.   September 18, 1915.)

No. 30.

1. COMMERCE ☞98—INTERSTATE COMMERCE COMMISSION—REVIEW OF PRO-
CEEDINGS.

A conclusion of the Interstate Commerce Commission upon a question
of fact, such as the reasonableness of a rate or the giving of a preference,
whose correctness depends wholly upon a consideration of the weight to
be given evidence before it, will not be reviewed by the court; but a
conclusion which plainly involves, under the undisputed facts, an error of
law, or which is shown to be supported by no substantial evidence, or to
be contrary to the indisputable character of the evidence, thereby likewise
involving an error of law, will be so reviewed.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 148;  Dec. Dig.
☞98.]

2. CARRIERS ☞32—REGULATION—STATUTORY PROVISIONS—"FACILITY FOR IN-
TERCHANGE OF TRAFFIC."

An arrangement whereby the entire switching service of each of two
railroad companies over tracks separately or jointly owned by them is
performed jointly by both operating as joint principals through a ter-
minals association maintained by them as their joint agent, each switch-
ing for both itself and the other railroad, the charge therefor based on
actual cost being made against the road having the transportation haul is
a reciprocal switching arrangement, and constitutes a facility for the
interchange of traffic between the lines to two railroads within Inter-
state Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 380 [Comp. St. 1913,
§ 8565]) § 3, providing that every common carrier shall, according to
respective powers, afford all reasonable, proper, and equal facilities for
the interchange of traffic between their respective lines, and for the
receiving, forwarding, and delivering of passengers and property to and
from their several lines and those connecting therewith, and shall not dis-
criminate in their rates between such connecting lines; and hence the
railroads doing such switching must afford equal facilities to all other
lines for like interchange of traffic without discrimination.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85;  Dec.
Dig. ☞32.

For other definitions, see Words and Phrases, First and Second Series,
Facilities.]

3. CARRIERS ☞32—REGULATION—STATUTORY PROVISIONS—"UNJUST DISCRIMI-
NATION."

Where the entire switching service of two railroad companies was per-
formed jointly by both operating as joint principals through a terminals
association as joint agent and the physical conditions surrounding the
interchange of traffic between such roads were not substantially different
from those surrounding the interchange of traffic between the lines and
those of another road not a member of the Terminals Association, and
the cost to the former being the same whether the traffic was competitive
or not, the refusal of such roads to switch competitive traffic to and
from the third road on the same terms as the noncompetitive traffic, while
interchanging both kinds of traffic on the same terms with each other,
constituted an "unjust discrimination" under Interstate Commerce Act, §
3, requiring every common carrier to afford all reasonable, proper, and
equal facilities for the interchange of traffic to connecting lines without
discrimination, regardless of the fact that joint terminals have been con-

structed by the two members of the association at great expense and are maintained by them.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 83–85; Dec. Dig. ☞32.

For other definitions, see Words and Phrases, First and Second Series, Unjust.]

4. CARRIERS ☞33—REGULATION—STATUTORY PROVISIONS—VALIDITY.

An order of the Interstate Commerce Commission, requiring that certain railroad companies which had entered into an agreement for a reciprocal switching should cease to maintain a practice whereby they refused to switch interstate competitive traffic to and from the tracks of another road on the same terms as interstate noncompetitive traffic, while interchanging both kinds of traffic on the same terms with each other, and that they should establish rates for such other road, which should not be different from those maintained with respect to similar shipments from their respective tracks, is not invalid as requiring the parties to the switching agreement to give the use of their tracks and terminal facilities to the third road within the proviso of Interstate Commerce Act, § 3, that common carriers shall not be required to give the use of their tracks or terminal facilities to another carrier engaged in like business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. ☞33.]

5. CARRIERS ☞33—REGULATION—RATES.

An order of the Interstate Commerce Commission, requiring certain railroads which had entered into a reciprocal switching agreement to allow another road to participate in its facilities upon equal terms, is not invalid as involving transportation rather than switching, and requiring the establishment of a joint rate and through route.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. ☞33.]

6. CONSTITUTIONAL LAW ☞297—DUE PROCESS—REGULATION OF COMMERCE.

An order of the Interstate Commerce Commission, requiring railroads doing reciprocal switching under a joint agreement to allow a third railroad to participate in the facilities thereof on equal terms, is not invalid as taking property without due process of law.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 832–834; Dec. Dig. ☞297.]

7. CARRIERS ☞33—REGULATION—SWITCHING OPERATIONS.

An order of the Interstate Commerce Commission, requiring railroads which are parties to a reciprocal switching arrangement to allow another railroad to participate in the facilities thereof on equal terms, was not invalid because one of the parties to such arrangement had no track connection with the third road within the switching limits of the terminals maintained by the parties to the agreement, where it connected with such road within such switching limits over the lines of another party to the agreement.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. ☞33.]

8. CARRIERS ☞33—REGULATION—SWITCHING AGREEMENTS.

An order of the Interstate Commerce Commission, requiring railroads doing their switching under a reciprocal agreement to allow a third road to participate in the facilities thereof, was not invalid as against the objection that it required the admission of such third into the switching agreement, or to do switching at less than the actual cost of service.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec. Dig. ☞33.]

9. CARRIERS ⊜~33—REGULATION—SWITCHING OPERATION.
    An order of the Interstate Commerce Commission, requiring roads
which were doing their switching under a reciprocal agreement to give
equal facilities to a third road, was not objectionable as requiring the
abrogation of the switching agreement.
    [Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 86–90; Dec.
Dig. ⊜~33.]

10. COMMERCE ⊜~91—INTERSTATE COMMERCE COMMISSION—REVIEW—"FINAL
    HEARING."
    A hearing before three judges of a motion to dismiss for want of equity
a petition to set aside an order of the Interstate Commerce Commission is
a final hearing within the meaning of Act Oct. 22, 1913, c. 32, 38 Stat. 220
(Comp. St. 1913, § 998), relating to final hearings before three judges of
any suit brought to sustain or set aside an order of the Interstate Com-
merce Commission.
    [Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 338–355;
Dec. Dig. ⊜~91.
    For other definitions, see Words and Phrases, First and Second Series,
Final Hearing or Trial.]

11. INJUNCTION ⊜~114—GROUNDS—INJURY.
    An order made by the Interstate Commerce Commission in reference to
switching operations against a holding company carrying on no railroad
or switching operations whatever, and which cannot apply or affect such
holding company in any way, involves merely abstract and theoretical
injuries, without substantial prejudice, and will not be enjoined at its
instance.
    [Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 202–220;
Dec. Dig. ⊜~114.]

In Equity. Petition by the Louisville & Nashville Railroad Com-
pany and others against the United States and others, to set aside an
order of the Interstate Commerce Commission. Motion denied, and pe-
tition dismissed.

Edward S. Jouett and William A. Colston, both of Louisville, Ky.
(Henry L. Stone, of Louisville, Ky., on the brief), for Louisville & N.
R. Co.

Claude Waller, of Nashville, Tenn. (R. Walton Moore and Frank
W. Gwathmey, both of Washington, D. C., on the brief), for Nashville,
C. & St. L. Ry.

Blackburn Esterline, Sp. Asst. Atty. Gen., of Chicago, Ill. (Lee
Douglas, U. S. Atty., of Nashville, Tenn., on the brief), for the United
States.

Edward W. Hines, of Washington, D. C. (Joseph W. Folk, of Wash-
ington, D. C., on the brief), for Interstate Commerce Commission.

Albert G. Ewing, Jr., F. M. Garard, and T. M. Henderson, all of
Nashville, Tenn., for City of Nashville and Traffic Bureau of Nash-
ville.

Before WARRINGTON, Circuit Judge, and McCALL and SAN-
FORD, District Judges.

PER CURIAM. The Louisville & Nashville Railroad Company,
the Nashville, Chattanooga & St. Louis Railway Company, and the
Louisville & Nashville Terminal Company, hereinafter called the Louis-

⊜~For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

ville & Nashville, the Nashville & Chattanooga, and the Terminal Company, respectively, having filed a petition against the United States, the Interstate Commerce Commission, and others, to set aside a certain order made by the Commission in the matter of the switching of competitive traffic at Nashville, Tenn., entered a motion for an interlocutory injunction restraining the enforcement of this order pendente lite. This motion was heard by three judges, as provided by the act of October 22, 1913 (38 Stat. 220, c. 32 [Comp. St. 1913, § 998]); the hearing being had upon the petition and exhibits, the answers of certain of the defendants, and affidavits filed by the petitioners on the question of irreparable injury. There were also heard motions of the United States and of the Commission to dismiss the petition, based, in substance, on want of equity upon its face.

The order sought to be enjoined was made by the Commission in proceedings instituted by the city of Nashville and its Traffic Bureau, wherein, among other things, they complained, in effect, that the rates and practices of the Louisville & Nashville and the Nashville & Chattanooga affecting the interchange and switching of competitive car traffic at Nashville, established by agreement and concert of action among the petitioners, subjected competitive car load traffic received and delivered at Nashville from and to the Tennessee Central Railroad Company, hereinafter called the Tennessee Central, to undue and unreasonable prejudice and disadvantage, in violation of section 3 of the Interstate Commerce Act, and prayed that they be required to desist from such violation, and for general relief. Answers having been filed and evidence taken, the Commission filed its written report, containing its findings of fact and conclusions thereon, which were, in substance, that the petitioners refuse to switch competitive traffic to and from the Tennessee Central at Nashville, upon the same terms as noncompetitive traffic, while interchanging both kinds of traffic on the same terms with each other, and that, since the interchange of traffic between the petitioners' lines and the Tennessee Central does not differ substantially from the conditions of interchange between the petitioners' own lines, this is unjustly discriminatory. City of Nashville v. Louisville & Nashville Railroad Co., 33 Inter. Com. Com'n, 76. And thereupon the Commission issued the order in question, requiring that the petitioners should cease on or before a specified date, and thereafter abstain, from maintaining a practice whereby they refuse to switch interstate competitive traffic to and from the tracks of the Tennessee Central at Nashville on the same terms as interstate noncompetitive traffic, while interchanging both kinds of traffic on the same terms with each other, and that they should, on or before such date, establish, publish, and thereafter maintain and apply to the switching of interstate traffic to and from the tracks of the Tennessee Central at Nashville rates and charges which should not be different from those which they contemporaneously maintain with respect to similar shipments from their respective tracks in such city.

The petitioners, having exhibited with their petition a transcript of all the evidence before the Commission, earnestly insist in support of their motion for an interlocutory injunction that the conclusions

of the Commission are not supported by any substantial evidence, and are contrary to the indisputable character of the evidence; that, as shown by the undisputed evidence, the Terminal Company does not handle any traffic or switch any freight at all; that, as shown by the indisputable character of the evidence, the Louisville & Nashville and the Nashville & Chattanooga do not interchange traffic with or switch traffic for each other, but each does its own switching, under a valid joint arrangement, which, in effect, merely gives them reciprocal trackage rights over each other's property and is not subject to regulation by the Commission under the Interstate Commerce Act; and, further, that this arrangement is maintained under circumstances and conditions wholly dissimilar to those involved in the switching of traffic to and from the Tennessee Central, and hence does not constitute discrimination. On the other hand, the defendants contend that it appears from the petition and the testimony before the Commission exhibited therewith that the conclusions of the Commission are supported by substantial evidence, and are not contrary to the indisputable character of the evidence; that they involve no error of law, and that hence they are not subject to review by the court in this proceeding, and the injunction should accordingly be denied and the petition dismissed for want of equity upon its face.

[1] It is well settled, on the one hand, that a conclusion of the Commission upon a question of fact, such as the reasonableness of a rate or the giving of a preference, whose correctness depends wholly upon a consideration of the weight to be given evidence before it, will not be reviewed by the court; and, on the other hand, that a conclusion which plainly involves, under the undisputed facts, an error of law, or which is shown to be supported by no substantial evidence or to be contrary to the indisputable character of the evidence, thereby likewise involving an error of law, will be so reviewed. Pennsylvania Co. v. United States, 236 U. S. 351, 361, 35 Sup. Ct. 370, 59 L. Ed. 616; Louisville Railroad v. United States (D. C.) 216 Fed. 672, 679 (three judges), and cases therein cited.

The material facts established by the undisputed evidence before the Commission and set forth, in the main, in its detailed findings, may be thus summarized:

Nashville is traversed and served by three railroads—the Louisville & Nashville, extending through from the north to the south; the Nashville & Chattanooga, from the west to the southeast; and the Tennessee Central, from the northwest to the east. The Louisville & Nashville and the Nashville & Chattanooga entered the city many years ago; the Tennessee Central in recent years. The Louisville & Nashville and the Nashville & Chattanooga are natural competitors for Nashville traffic, and each competes for such traffic with the Tennessee Central. All three railroads have extensive terminals in the city, with depots, yards, and tracks; their respective tracks reaching industries located mainly in different sections of the city, but partly in the same sections. The tracks of the Tennessee Central are connected with those of the Nashville & Chattanooga by an interchange track at Shops Junction, in the western section of the city, and with those of the

Louisville & Nashville by an interchange track at Vine Hill, just outside the city on the south. The tracks of the Louisville & Nashville and the Nashville & Chattanooga are connected at several points, but principally in the joint terminals operated by them in the center of the city, as hereinafter set forth. The entire situation is fully shown by a map accompanying the report of the Commission. 33 Inter. Com. Com'n, supra, opinion, page 78.

Originally the northern and southern lines of the Louisville & Nashville had separate terminals in different sections of the city, and the Nashville & Chattanooga a terminal midway between them; there being no track connections in the city between any of these different terminals. In 1872, by agreement between the companies, the Louisville & Nashville acquired, for the annual rental of $18,000 and other valuable considerations, perpetual trackage rights connecting its two terminals with each other and with the terminal of the Nashville & Chattanooga; this agreement also contemplating the construction of a union passenger station on the depot grounds of the Nashville & Chattanooga.

In 1880 the Louisville & Nashville began to acquire the capital stock of the Nashville & Chattanooga, and now owns slightly more than 71 per cent. thereof.

In 1893, to facilitate the construction of the proposed union station and other terminal facilities, the Louisville & Nashville and the Nashville & Chattanooga caused their competitor, the Terminal Company, to be organized, under the general incorporation laws of Tennessee. These laws give terminal companies the right to lease their property and terminal facilities to any railroad company utilizing them, upon such terms and time as may be agreed upon by the parties. The Louisville & Nashville owns all of the capital stock of the Terminal Company.

On April 27, 1896, the Louisville & Nashville and the Nashville & Chattanooga, by separate indentures, leased to the Terminal Company for 999 years all of the property and railroad appurtenances thereon which they severally owned or controlled within or in the immediate vicinity of the original depot grounds of the Nashville & Chattanooga. In each of these leases the amount of the stipulated rental was left blank; the Terminal Company, however, covenanting to keep the premises in repair and to pay all accruing taxes.

On June 15, 1896, the Terminal Company leased to the Louisville & Nashville and the Nashville & Chattanooga, jointly, for 999 years, all the premises acquired by it under the former leases from them, together with all other premises which it had subsequently acquired, or might thereafter acquire. Under this lease the Terminal Company covenanted to construct upon the leased premises all passenger and freight buildings, tracks, and other terminal facilities suitable and necessary for such railroads centering at Nashville as might contract with it therefor, and to pay all taxes and insurance upon the leased premises and the improvements to be constructed thereon; while the two railroad companies agreed to pay it annually, as rental for the leased premises and the improvements thereon, 4 per cent. upon the actual cost of the acquisition of the premises and the construction of the

improvements, in addition to the amount of the taxes and insurance, and further agreed to keep the leased' properties in repair.

On June 21, 1898, the Terminal Company entered into a contract with the city of Nashville whereby it agreed to construct a union passenger station on the premises covered by the above-mentioned leases, with freight depots, tracks, switches, etc., and viaducts over its tracks and certain new streets and extensions of streets; the city agreeing to secure the condemnation of land, close certain streets, and erect approaches to certain of the viaducts. The Louisville & Nashville and the Nashville & Chattanooga, in consideration of the benefits to be received by them from the proposed improvements, guaranteed the performance of the obligations of the Terminal Company under the contract. This contract made no provisions for future railroads.

The improvements agreed upon, including the passenger station, depot, tracks, etc., were duly made, being completed in 1900. The tracks thus constructed by the Terminal Company are connected with those of the Louisville & Nashville and the Nashville & Chattanooga, but not with those of the Tennessee Central.

The contribution of the city to these improvements cost approximately $100,000, while the total cost to the Terminal Company was considerably in excess of $2,000,000. To enable the Terminal Company to acquire the additional properties which it had purchased in addition to those leased to it by the two railroads, and to construct these improvements, the Louisville & Nashville and the Nashville & Chattanooga from time to time advanced to it the necessary funds. To repay these advances the Terminal Company executed a mortgage securing an authorized issue of $3,000,000 of bonds. These bonds were guaranteed by the two railroads, under authority given by the Tennessee laws relating to terminal companies. Of these authorized bonds, $2,535,000 were actually issued, the proceeds of which were used to repay the advances made by the railroads.

During the construction of these terminal facilities the Louisville & Nashville and the Nashville & Chattanooga continued, as theretofore, to operate their respective terminals independently, under reciprocal switching arrangements, by which each switched cars for the other to and from their local destinations, at a uniform charge of $2 per car; this switching charge being absorbed on competitive traffic by the railroad having the transportation haul, while on noncompetitive traffic it was paid by the shipper or consignee.

On August 15, 1900, shortly after the completion of the terminal facilities by the Terminal Company, the Louisville & Nashville and the Nashville & Chattanooga, being then the only two railroads entering Nashville, as a matter, primarily at least, of economy in the operation of terminal facilities, entered into an agreement under which they have since maintained and operated joint terminal facilities at Nashville, the effect of which is the underlying matter of controversy in this case. The essential provisions of this agreement are as follows:

The two railroads created an unincorporated organization, styled in the agreement the "Nashville Terminals," and hereinafter called the Terminals, for the maintenance and operation of Terminals at Nash-

ville, embracing in such organization all the properties, buildings, tracks, and terminal facilities leased to them by the Terminal Company, together with certain other individually owned tracks, which they severally contributed and attached to said Terminals, consisting of 8.10 miles of main and 23.80 miles of side tracks contributed by the Louisville & Nashville, and 12.15 miles of main and 26.37 miles of side tracks contributed by the Nashville & Chattanooga. The agreement further provided: (a) That the entire properties thus included within the Terminals should be maintained and operated, as such, under the management of a board of control, consisting of a superintendent of the Terminals and the general managers of the two railroads, the operation of the Terminals to be under the immediate control of the superintendent, who should appoint, subject to the approval of the board, a station master, master of trains, and other designated officers, each of whom should have a staff of employés for the conduct of his department. (b) That the expenses of maintaining and operating the terminals should be apportioned between the two railroads as follows: Passenger service expenses (including all expenses of the union passenger station) in proportion to the number of passenger-train cars and locomotives handled by the Terminals for each; siding expenses (to be ascertained on the basis of the number of hours that yard engines were engaged in switching to and from house and private siding, and bulk or team tracks, as compared with the total number of hours that they were engaged in all classes of service) in proportion to "the total number of cars placed on and withdrawn from house and private sidings, bulk or team tracks (by the Terminals) for each" railroad; train-yard expenses, in proportion to the number of all cars and train locomotives received and forwarded by the Terminals for each; and general expenses, in proportion to the average percentages of the three other expense accounts; provided, that before such apportionment of expenses, there should be deducted from the aggregate expenses all moneys received by the Terminals for room rents, restaurant and news stand privileges, etc., and services rendered any other persons. (c) That the separate freight stations and appurtenant tracks of each railroad and the tracks allotted to each for receiving and delivering bulk freights should be maintained and operated by the Terminals for each of them direct, and the expenses thereof charged directly to each; a like provision being made in reference to the operation of the Terminal roundhouse for the Louisville & Nashville alone. (d) That each railroad should set apart and allot to the use of the Terminals switching engines adequate to the work of switching and pulling trains in and about the Terminals, corresponding in efficiency to the proportion of work performed for each, which should be maintained and kept in repair by the Terminals and for which it should pay the railroads 4 per cent. annually upon their valuation at the time of allotment. And (e) That the rights, privileges, and uses of all the property in the Terminals by the respective railroads should be "the same, equal and joint, and none other," except only as to the bulk tracks, etc., operated for each separately.

In operating under this agreement all the work of breaking up incoming freight trains of both railroads after they come into the central

yards of the Terminals, and of collecting and making up outgoing freight trains for both railroads before they leave such yards, is performed by the Terminals. Thus, when an incoming freight train comes in on the line of either railroad into the central yards, all cars destined for industries located within the Terminals, either on the tracks jointly leased to the Terminal Company or on the tracks of either railroad otherwise included within the Terminals, are switched by the Terminals to such local destination, without distinction as to the particular tracks on which such industries are located; and, conversely, freight cars loaded at industries located on any of such tracks for transportation out of Nashville on the line of either railroad are switched by the Terminals to the central yards and made up into the outgoing train. In other words, the entire switching service in reference to either the incoming or the outgoing freight trains of each railroad to and from the separate and joint tracks of both railroads is performed by the Terminals, acting as joint agent of the two railroads under the Terminals agreement. However, in accordance with this agreement, the only direct charge for such switching service is, in effect, made against the railroad having the transportation haul, in accordance with the provision that the siding expenses shall be apportioned between the two railroads in proportion to "the total number of cars placed on and withdrawn from house and private sidings, bulk and train tracks, for each of the parties." Obviously, however, this apportionment of siding expenses does not represent the entire actual cost incident to the switching services, as it does not include any part of the general expenses and fixed charges of the Terminals, which are apportioned between the two railroads upon a different basis, as provided by the agreement.

The interchange track between the Nashville & Chattanooga and the Tennessee Central at Shops Junction is within the switching limits of the Terminals under this agreement, but the interchange track between the Louisville & Nashville and the Tennessee Central at Vine Hill is outside of these switching limits.

On December 3, 1902, the Terminal Company, the Louisville & Nashville, and the Nashville & Chattanooga entered into an agreement, reciting that the two leases of April 27, 1896, from the railroads to the Terminal Company had been canceled and abrogated; modifying the lease of June 25, 1896, from the Terminal Company to the railroads, so that thereafter it should only include certain tracks and parcels of land that had been directly acquired by the Terminal Company, and should be otherwise rescinded and abrogated and the properties of the railroads otherwise respectively restored as they were prior to the lease, subject only to the mortgage that had been executed thereon by the Terminal Company to secure its issue of bonds; reducing the term of the lease to 99 years; and modifying, in certain respects, the provisions of the lease as to the rental to be paid.

The terminal tariffs of both railroads publish service by the Terminals, and provide that "there is no switching charge to or from locations on tracks of the Nashville Terminals, within the switching

limits, on freight traffic, car loads, from or destined to Nashville" over either railroad, "regardless of whether such traffic is from or destined to competitive or noncompetitive points."

The Tennessee Central entered Nashville in 1901–1902, after strong opposition from the Louisville & Nashville, and leased its terminal facilities, consisting of a passenger station, freight depots, tracks, etc., from another Tennessee railroad terminal corporation that had been organized in 1893.

Prior to 1907 neither the Louisville & Nashville nor the Nashville & Chattanooga would interchange traffic with the Tennessee Central at Nashville, or any other point of connection. In that year, however, they both began to interchange with the Tennessee Central at Nashville all noncompetitive traffic, exclusive of coal traffic, at the rate of $3 per car; noncompetitive Nashville traffic being defined as traffic between Nashville and points reached only by one railroad into Nashville, or points served by two or more railroads into Nashville, for which, however, one railroad can maintain rates which the others cannot meet. This interchange of noncompetitive traffic between both the Louisville & Nashville and the Nashville & Chattanooga was and is effected by the connection between the Tennessee Central and the Nashville & Chattanooga at .Shops Junction; there being no direct connection between the Tennessee Central and the Louisville & Nashville.

On December 9, 1913, upon complaint by the city of Nashville and others, the Commission found that the Louisville & Nashville and the Nashville & Chattanooga switched all traffic for each other at Nashville, but refused to switch coal to and from the Tennessee Central except at a prohibitive rate, thereby unjustly discriminating against coal to and from the Tennessee Central in favor of coal to and from each other's lines, and entered an order requiring the Louisville & Nashville and the Nashville & Chattanooga to abstain from maintaining any different practice with respect to switching interstate car load shipments of coal from and to the Tennessee Central at Nashville from that maintained with respect to similar shipments from and to their respective tracks. The Louisville & Nashville and the Nashville & Chattanooga thereupon filed a petition in this court, seeking to restrain the execution of this order, and applied for an interlocutory injunction, which was denied by this court. Louisville Railroad v. United States (D. C.) 216 Fed. 672 (three judges). This decision was recently affirmed, on appeal, by the Supreme Court. Louisville Railroad v. United States, 238 U. S. 1, 35 Sup. Ct. 696, 59 L. Ed. 1177. This order, however, was interpreted by both railroads as relating exclusively to noncompetitive coal, and while they have since that time switched noncompetitive coal to and from the Tennessee Central at $3 per car, the same as other noncompetitive traffic, they have not changed their former practice relative to competitive coal.

A table introduced in evidence by the petitioners (33 Inter. Com. Com'n, at page 83), shows the average cost to the Terminals of handling city freight traffic to be, exclusive of fixed charges, $4.128 per car. The Commission was of opinion that, while these figures

might not be absolutely correct, they were not ·shown· to be substantially incorrect, and that the charge of $3 per car for switching Tennessee Central noncompetitive traffic was not shown to be unreasonably high, a conclusion in which we entirely concur.

The Louisville & Nashville will switch competitive coal and·other competitive traffic at Nashville to and from the Tennessee Central, but only at its local rates, such interchange being usually effected through the agency of the Terminals, at Shops Junction, over the rails of the Nashville & Chattanooga. ·For a while the Nashville & Chattanooga would, in like manner, perform the same switching service to· and from the Tennessee Central at its local rates; its published terminal tariff of December 14, 1913, expressly providing that such local rates would apply on competitive traffic from and destined to the Tennessee Central. Since January 25, 1914, however, shortly after the complaint in this case was filed, its terminal tariff has provided that competitive traffic will not be switched to and from the Tennessee Central, and no local rate applicable thereto has been published. The terminal tariff of the Tennessee Central provides that Louisville & Nashville and Nashville & Chattanooga competitive traffic will be switched at its local rates. The local rates applied to such switching by the Louisville & Nashville total from $12 to $36 per car, by the Nashville & Chattanooga, from $7 to $36 per car, and by the Tennessee Central from $5 to $36 per car. These rates are virtually prohibitive. The Tennessee Central favors their reduction, but will not reduce its rates until the other railroads do likewise.

The cost to the Terminals of switching competitive Tennessee Central traffic is the same as the cost of switching noncompetitive. The Louisville & Nashville interswitches competitive and noncompetitive traffic on the same terms with other carriers at Memphis, Tenn., Birmingham, Ala., and several other points. The Nashville & Chattanooga interswitches both kinds of traffic with all other carriers at all connection points at the same rates, except with the Tennessee Central at Nashville, having had in effect at Lebanon, Tenn., where it also connects with the Tennessee Central, a switching charge of $2 per car for both kinds of traffic since November 14, 1914.

The physical conditions surrounding the interchange of traffic between the lines of the Louisville & Nashville and the Nashville & Chattanooga, on the one hand, and the Tennessee Central, on the other, in reference to the number and location of industries, the switching movements involved, and the like, are set forth in detail in the report of the Commission (33 Inter. Com. Com'n, at page 86). Without restating them here, it is sufficient to say that we entirely concur in the finding of the Commission that the physical conditions of interchange of traffic between the lines of the Louisville & Nashville and the Nashville & Chattanooga and the Tennessee Central are not shown to differ substantially from the conditions of interchange between the lines of the Louisville & Nashville and the Nashville & Chattanooga, and that, moreover, none of the conditions relating to the switching Tennessee Central traffic appear to· differ materially from the conditions of interchange between the lines of the Louisville & Nashville and the Nashville & Chattanooga prior to the establishment of the Terminals.

Upon the foregoing facts, we have, after careful consideration, reached the following conclusions:

[2] The operation jointly carried on by the Louisville & Nashville and the Nashville & Chattanooga under the Terminals agreement is not a mere exchange of trackage rights to and from industries on their respective lines at Nashville, under which each does all of its own switching at Nashville and neither switches for the other. It is, on the contrary, in substance and effect, an arrangement under which the entire switching service for each railroad over the joint and separately owned tracks is performed jointly by both, operating as principals through the Terminals as their joint agent, each railroad, as one of such joint principals, hence performing through such agency switching service for both itself and the other railroad. And the fact that the charge for such joint switching service is made on an approximately proportionate basis of actual cost, exclusive of fixed charges, against the railroad having the transportation haul, does not, in our opinion, change the underlying and dominant fact that the switching service itself is performed by both railroads jointly, that is, by each railroad operating as a joint principal through the means of the joint agency; the apportionment of the expenses relating only to the payment for the service and not to the joint performance of the service itself. And, viewed in its fundamental aspect, and considered with reference to its ultimate effect, we entirely concur in the conclusion of the Commission that such joint switching operation "is essentially the same as a reciprocal switching arrangement," constituting a facility for the interchange of traffic between the lines of the two railroads, within the meaning of the second paragraph of section 3 of the Interstate Commerce Act. That each railroad does not separately switch for the other, but that such switching operations are carried on jointly, is not, in our opinion, material. If it were, all reciprocal switching operations carried on by two railroads at any connecting point of several carriers could be easily put beyond the reach of the act, and its remedial purpose defeated, by the simple device of employing a joint agency to do such reciprocal switching. The controlling test of the statute, however, lies in the nature of the work done, rather than in the particular device employed or the names applied to those engaged in it. See, by analogy, United States v. Chicago Railroad, 237 U. S. 410, 413, 35 Sup. Ct. 634, 59 L. Ed. 1023.

Being, in effect, a reciprocal switching operation carried on by the Louisville & Nashville and the Nashville & Chattanooga, constituting a facility for the interchange of traffic between these two railroads, it necessarily follows, under section 3 of the Interstate Commerce Act, that equal facilities must be afforded all other lines for like interchange of traffic, without discrimination, and that, under section 15 of the act, the Commission is authorized to require the railroads performing such reciprocal service to desist from any discriminatory service in respect to such switching operations. Pennsylvania Co. v. United States, 236 U. S. 351, 35 Sup. Ct. 370, 59 L. Ed. 616; Louisville Railroad v. United States, supra, 238 U. S. 20, 35 Sup. Ct. 665, 59 L. Ed. 1177; Louisville Railroad v. United States (D. C.) supra, 216 Fed. 683.

[3] And in view of the fact that the physical conditions surrounding the interchange of traffic between the lines of the Louisville & Nashville and the Nashville & Chattanooga, on the one hand, and the Tennessee Central, on the other are not substantially different from those surrounding the interchange of traffic between the lines of the Louisville & Nashville and the Nashville & Chattanooga, and that the cost to the Louisville & Nashville and the Nashville & Chattanooga of switching competitive Tennessee Central traffic is the same as that of switching its noncompetitive traffic, we entirely concur in the conclusion of the Commission that the refusal of the Louisville & Nashville and the Nashville & Chattanooga to switch competitive traffic to and from the Tennessee Central on the same terms as noncompetitive traffic, while interchanging both kinds of traffic on the same terms with each other, is unjustly discriminatory. Such discrimination is not, in our opinion, obviated by the fact that the joint switching operation of the Louisville & Nashville and the Nashville & Chattanooga involves the use of the joint Terminals which they have constructed at great expense, or the fact that, under the Terminals agreement, they contribute to the expense of maintaining the Terminals and carry on their switching operations in the manner hereinbefore set forth. In Louisville Railroad v. United States (U. S.) supra, in which many of the facts hereinbefore set forth appeared in the report of the Commission, which had found, as a fact, that the Louisville & Nashville and the Nashville & Chattanooga switched for each other, the Supreme Court, affirming the decree of this court, said:

"Disregarding the complication arising out of joint ownership and the fact that each of the appellants switches for the other, it will be seen that the commission is not dealing with an original proposition, but with a condition brought about by the appellants themselves. Under the provisions of the Commerce Act (24 Stat. 380) the reciprocal arrangement between the two appellants would not give them a right to discriminate against any person, or 'particular description of traffic.' For section 3 requires Railroad Companies to furnish equal facilities for the interchange of traffic between their respective lines, * * * 'provided that this should not be construed as requiring any such common carrier to give the use of its tracks or terminal facilities to another carrier engaged in like business.' If the carrier, however, does not rest behind that statutory shield, but chooses voluntarily to throw the Terminals open to many branches of traffic, it to that extent makes the yard public. Having made the yard a facility for many purposes and to many patrons, such railroad facility is within the provisions of section 3 of the statute, which prohibits the facility from being used in such manner as to discriminate against patrons and commodities. The carriers cannot say that the yard is a facility open for the switching of cotton and wheat and lumber, but cannot be used as a facility for the switching of coal. Whatever may have been the rights of the carriers in the first instance; whatever may be the case if the yard was put back under the protection of the proviso to § 3—the appellants cannot open the yard for most switching purposes and then debar a particular shipper from a privilege granted the great mass of the public. In substance that would be to discriminate, not only against the tendering railroad, but also against the commodity which is excluded from a service performed for others. * * * In this case the controlling feature of the Commission's order is the prohibition against discrimination. It was based upon the fact that the appellants were, at the present time, furnishing switching service to each other on all business, and to the Tennessee Central on all except coal and competitive business. As long as the yard remained open and was used as a facility for switching purposes the Commission had

the power to pass an order, not only prohibiting discrimination, but requiring the appellants to furnish equal facilities 'to all persons and corporations without undue preference to any particular class of persons.'"

And such discrimination being shown, we think it clear that, under the provisions of the Interstate Commerce Act and the authorities above cited, the Commission is authorized to require the Louisville & Nashville and the Nashville & Chattanooga to desist from such discrimination, and to establish and maintain a practice in regard thereto which shall be nondiscriminatory.

[4–6] The order made by the Commission requires the Louisville & Nashville and the Nashville & Chattanooga to desist from maintaining a practice whereby they refuse to interchange interstate competitive traffic to and from the tracks of the Tennessee Central at Nashville on the same terms as interstate noncompetitive traffic, while interchanging both kinds of said traffic with each other on the same terms; and to establish, publish, maintain, and apply to the switching of interstate traffic to and from the Tennessee Central tracks rates and charges which shall not be different from those which they contemporaneously maintain with respect to similar shipments from their respective tracks in said city. We find in the record substantial evidence sustaining the conclusions of the Commission on which this order is based, and are of the opinion that, on the facts established by the evidence, this order involved no error of law, and is clearly within the power of the Commission. It is, in our opinion, not invalid as requiring the Louisville & Nashville and the Nashville & Chattanooga to give the use of their tracks and terminal facilities to the Tennessee Central, within the meaning of the proviso contained in section 3 of the Interstate Commerce Act, or as involving transportation rather than switching, and requiring the establishment of a joint rate and through route, or as violating the constitutional provision against taking property without due process of law. Louisville Railroad v. United States, supra, 238 U. S. 18, 20, 35 Sup. Ct. 696, 59 L. Ed. 1177; Louisville Railroad v. United States (D. C.) supra, 216 Fed. 684. Nor is it affected by the fact that the Louisville & Nashville owns the majority of the stock of the Nashville & Chattanooga.

[7] Neither is the order invalid as to the Louisville & Nashville by reason of the fact that it has no track connection with the Tennessee Central within the switching limits of the Terminals, since it, as a party to the Terminals agreement, is carrying on switching operations for itself and for the Nashville & Chattanooga over the tracks of the Nashville & Chattanooga, which connect with the tracks of the Tennessee Central by an interchange track within such switching limits.

[8] Neither does the order of the Commission, in our opinion, require the Louisville & Nashville and the Nashville & Chattanooga to either admit the Tennessee Central into the Terminals agreement, as a constituent member thereof, or to switch its competitive traffic at $3 per car, or at any other rate which may be less than the actual cost of service, exclusive of fixed charges. All that the order requires is that so long as they interchange competitive and noncompetitive traffic between their own lines on the same terms, they shall desist from making a distinction between competitive and noncompetitive Tennessee

Central traffic, and that they shall establish and maintain rates for switching interstate Tennessee Central traffic which shall not be different from those which they contemporaneously maintain with respect to switching similar traffic for each other; in other words, that they shall cease discrimination in interswitching their respective interstate competitive and noncompetitive traffic and that of the Tennessee Central.

[9] There is nothing in the order which requires the Louisville & Nashville and the Nashville & Chattanooga to abrogate their Terminals agreement; they are merely required, if they see fit to maintain it, to make no distinction, in operating under it, between competitive and noncompetitive Tennessee Central traffic, so long as they make no such distinction in their own traffic, and, whether they carry on their future switching operations separately or jointly, to publish and maintain rates applicable to the switching of interstate Tennessee Central traffic, both competitive and noncompetitive, which shall be the same as those for switching their own interstate traffic. If either the charges which they now make for switching noncompetitive Tennessee Central traffic, or those which, through the Terminals, they now make each other, are unreasonably low, as involving no element of fixed charges, or otherwise, this can be obviously remedied, consistently with the order of the Commission, by publishing and maintaining just and reasonable charges for switching their own interstate competitive and noncompetitive traffic, respectively, which shall likewise apply to the switching of similar Tennessee Central interstate traffic; although, of course, to the extent and in the proportion that they are proprietors of and share in the revenues of the Terminals, they will receive indirectly reimbursement for the switching charges made in reference to their own traffic.

[10] We therefore conclude that the application of the Louisville & Nashville and the Nashville & Chattanooga for a temporary injunction should be denied. And since there is exhibited with and as a part of the petition all the evidence taken before the Commission, we are constrained to conclude that the petition shows on its face no equity or ground for permanently enjoining the enforcement of the order of the Commission, which is the ultimate relief sought. We are hence of the opinion that the motions of the United States and of the Commission to dismiss the petition should, as to the petitioning railroads, be sustained; this being a matter within the authority of the three judges now composing the court, under the provision of the act of 1913, supra, relating to the final hearing before three judges of any suit brought to suspend or set aside an order of the Commission; the hearing of a motion to dismiss a petition for want of equity being, in our opinion, a final hearing within the meaning of such provision.

[11] And while the Terminal Company is shown by the proof to be solely a holding company carrying on no railroad or switching operations whatever, the order rendered against it by the Commission having been apparently inadvertently made and probably intended against the Terminals, the unincorporated association through which the two railroads carry on their switching operations, yet no material

injury to it is shown from the order, which apparently cannot apply to or affect it in any way. Hence no ground for the issuance of an injunction appears at its instance, either interlocutory or permanent; a court of equity not enjoining merely abstract and theoretical injuries which involve no substantial prejudice. People v. Canal Board, 55 N. Y. 390; Drummond Tobacco Co. v. Randle, 114 Ill. 412, 2 N. E. 536; Willcox v. Trenton Potteries, 64 N. J. Eq. 173, 53 Atl. 474; Atkins v. Chilson, 7 Metc. (Mass.) 398.

A decree will accordingly be entered denying the motion of the petitioners for an interlocutory injunction, sustaining the motions of the United States and of the Commission, and dismissing the petition, with costs.